## STATE OF TEXAS v. ANDERSON, CLAYTON & CO. et al.*

### No. 8227.

Circuit Court of Appeals, Fifth Circuit.

Sept. 4, 1937.

Rehearing Denied Sept. 29, 1937.

*Writ of error denied 58 S.Ct. 265, 82 L.Ed. ——.

See, also, Anderson, Clayton & Co. v. Wichita Valley R. Co., 15 F.Supp. 475.

Wm. McCraw and Wm. Madden Hill, both of Austin, Tex., and A. L. Reed, of Dallas, Tex., for the State of Texas.

John H. Crooker and Carl G. Stearns, both of Houston, Tex., and J. H. Barwise and Fred L. Wallace, both of Fort Worth, Tex., for appellees.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

FOSTER, Circuit Judge.

Appellee, Anderson, Clayton & Co., an unincorporated joint-stock association, brought this suit, on behalf of itself and all others similarly situated, against the Wichita Valley Railway Company, Fort Worth & Denver City Railway Company, and Burlington-Rock Island Railroad Company, alleging jurisdiction under section 24(8), Judicial Code (28 U.S.C.A. § 41(8), as a suit arising under the interstate commerce laws, and under the provisions of the Declaratory Judgment Act, Act March 3, 1911, as amended (28 U.S.C.A. § 400).

The case as shown by the pleadings and proof is this. Anderson, Clayton & Co., hereafter referred to as plaintiff, is a dealer in raw cotton, doing a large business, with headquarters at Houston, Tex. Plaintiff buys cotton intended for export or shipment to states other than Texas, in bales, in small lots, at interior points in Texas, and assembles it in carload lots at various shipping points along the lines of defendants. Carload rates vary and are based on capacities of 25,000, 50,000 and 75,000 pounds, approximately. 50, 100, and 150 bales. It is then transported to Houston by these carriers. The railroad agents are notified that the cotton is intended for export or interstate shipment, and it moves on through bills of lading, appropriately marked to so indicate.

In the usual course of business, cotton is purchased by plaintiff through its own representative or over the telephone from the main office. A written confirmation is immediately sent the seller, setting out the conditions of the purchase. Shipping instructions are given the seller, and he delivers the cotton to the railroad and usually receives a bill of lading "to shipper's order, notify Anderson, Clayton & Co." The seller indorses the bill of lading over to plaintiff, draws a draft on plaintiff for the price, and negotiates the draft with a local bank.

The draft is paid by plaintiff on presentation. Insurance on the cotton in favor of plaintiff attaches as soon as the bill of lading is indorsed.

At Houston the cotton is weighed, sampled, classed, and, according to grade, is appropriated, with other similar cotton, to orders in hand, for shipment to foreign countries or states other than Texas or for replacement of their own stocks of spot cotton at such points of destination. Sales for export are usually round lots of 50 or 100 bales. The cotton is compressed to high density, if that has not already been done, and then moves to its ultimate destination by ocean carrier, sometimes the same day it is received, but the average delay is seven to eight days.

From a typical transaction set out in the bill the following appears: For the purpose of filling contracts previously executed, a lot of thirty bales of cotton was purchased on September 28, 1935, from the Rochester Gin Company of Rochester, Tex., who delivered it to the Wichita Valley Railway Company at Weinert, Tex., for transportation to Houston. The railroad issued a through export bill of lading to the Gin Company. The Wichita Valley Railway transported the cotton to Wichita Falls, Tex., and delivered it to the Houston Compress Company. The cotton was compressed and consolidated with other cotton into a carload lot. It was transported from Wichita Falls by the Fort Worth & Denver City Railway Company to Teague, Tex., where it was delivered to the Burlington-Rock Island Railroad Company, and was by it transported to Houston, where it arrived on October 12, 1935. At Houston the cotton was discharged in the warehouse of the Houston Compress Company, where it was graded, sampled, and assembled with sufficient other bales of cotton of uniform grade and quality to fill orders for export. The cotton was appropriated to seven different contracts in the proportions of one to eighteen bales. Twenty-nine bales were shipped to Japan on three vessels, and one bale was shipped to England on a different vessel. Deliveries were made to the vessels on October 12, 17, 18, 25, and 29 and November 5, 1935. The local consumption of raw cotton at Texas ports is negligible. The method used by plaintiff in buying, selling, and shipping cotton for export is general in the trade.

Defendants and other railroads have entered into a joint agreement under which

through rates are provided and a tariff covering these rates, designated as Texas-Louisiana Lines' Tariff No. 71-C, I. C. C. No. 382, has been filed with and approved by the Interstate Commerce Commission. The tariff applies to both interstate and intrastate commerce with certain exceptions. A rule of the Texas Railroad Commission requires that cotton moving from interior points must be compressed for shipment at the nearest compress to the point of origin in either direction. Tariff No. 71-C, I. C. C. No. 382, recognizes this rule, but item No. 280 contains the following exception: "Exceptions applicable only on interstate traffic. Exception 2.—The F. W. & D. C.-W. V. will permit shippers to compress and consolidate shipments of cotton at compress points (other than the first) on said lines when in direct line of transit. * * *" The exception applies to all the defendant railroads as connecting carriers. The through rate was applied to certain shipments to plaintiffs, set out in the bill, and they were permitted to compress the cotton at presses in direct line between the point of shipment and Houston, regardless of whether they were the nearest to point of origin.

A hearing was provoked before the Texas Railroad Commission by interested parties and the question of whether shipments as above outlined were interstate or intrastate was considered. The Commission ruled that such shipments were wholly intrastate, and, on December 6, 1935, the railroads were ordered to apply the rule as to compressing and collect charges under intrastate tariffs.

In conformity with this ruling defendants instituted a number of suits against plaintiffs for undercharges, based upon the sum of the local rates; announced their intention to file other suits of the same nature; and notified plaintiff that in future they must comply with the ruling of the Texas Railroad Commission as to compressing or pay the combination of local rates.

The State of Texas was permitted to intervene in the case by order of court, without objection by any of the parties. The intervention asserted the validity of the orders made by the Railroad Commission; alleged that shipments as above outlined were wholly intrastate; that plaintiffs and defendants had conspired to give them a fictitious interstate character; and asked that the state be made a party defendant. There were no other interventions.

After an extensive hearing, a final decree was entered, holding that the court had jurisdiction and plaintiff was entitled to a declaratory judgment; that shipments as above outlined were interstate and not governed by the laws of Texas and not under the jurisdiction of the Texas Railroad Commission; that all such shipments of cotton moving after September 16, 1935, the effective date of the Texas-Louisiana Lines Tariff No. 71-C, were entitled to the privileges and benefits of exception No. 2 above quoted. The decree denied an injunction as to the pending suits for undercharges, but granted an injunction as to the prosecution of such future suits. Defendants were further enjoined from refusing to accord the shipments of cotton by plaintiffs, such as above described, the rights and privileges of compression and consolidation provided for in the interstate tariffs; and from taking any action to require plaintiffs to compress or consolidate such shipments only at points prescribed in the tariffs for intrastate shipments; and from demanding or collecting from plaintiffs the combination of local rates upon such shipments. The State of Texas was specifically denied any relief.

Only the State of Texas has appealed. Appellee has moved to dismiss the appeal on the grounds that the State is without appealable interest and that there was no summons or severance as to the defendants. There may be some doubt as to the right of the State to intervene and, had that been denied, a different question would be presented. By the intervention the State became a real, not merely a nominal, party to the suit and is materially affected by the declaratory judgment. It is elementary that a real party against whom a judgment runs has a right of appeal. On the second ground, while the judgment is joint in form, on analysis, it is clear that it is several. The judgment could be separately enforced against the defendant railroads by coercive action. But to enforce it against the State would require ancillary proceedings against the proper state officers. We consider that severance of the defendants was not necessary. Elliot v. Lombard, 292 U.S. 139, 54 S.Ct. 637, 78 L.Ed. 1175. The motion to dismiss the appeal is denied.

In this case it is immaterial when the purchase price was actually paid. Nor is the form of the bill of lading material. The rights and duties of buyer and seller were fixed by the usual contracts of pur-

chase before the shipment of the cotton began at the interior points and all shipments were for account of the buyer. There is no doubt whatever that when the cotton was purchased and caused to be shipped from interior points in Texas it was the intention of plaintiff that it would be ultimately shipped to other states and foreign countries and that purpose was accomplished by shipment from Houston.

As the case is governed by well-known rulings of the Supreme Court, it would serve no good purpose to attempt to review the numerous authorities cited by the parties. It is well settled that, in determining whether a particular movement of freight is interstate or intrastate or foreign commerce, the intention existing at the time the movement starts governs and fixes the character of the shipment. If the shipment comes to rest within the state of origin and the goods are thereafter disposed of locally, the interstate character of the shipment is lost, but temporary stoppage within the state, made necessary in furtherance of the interstate carriage, does not change its character.

What was done at Houston to prepare the shipments for export made no change in the character of the cotton. The identical bales shipped at interior points were ultimately forwarded in interstate or foreign commerce. The stoppage at Houston was temporary and slight. In all shipments by water there are delays at the seaport, usually incident to the arrival and loading of the vessel. It would be idle to say that such delays break the continuity of the interstate journey and cause the freight to come to rest within the state. The stoppage of the cotton at Houston had no more effect than this.

We consider that what is shown to have been done at Houston to prepare the cotton for further shipment and the appropriating of a single shipment from the interior to more than one order for export or for further shipment in interstate commerce did not deprive the movement within the state of its interstate character. The following authorities sustain this conclusion: Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715; Swift & Co. v. U. S., 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; So. Pac. Terminal Co. v. I. C. C., 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310; Texas & N. O. R. R. Co. v. Sabine Tram Co., 227 U. S. 111, 33 S.Ct. 229, 57 L.Ed. 442; R. R. Comm. of La.

v. T. & P. Ry. Co., 229 U. S. 336, 33 S.Ct. 837, 57 L.Ed. 1215; Stafford v. Wallace, 258 U. S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; Board of Trade of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839.

The judgment appealed from is affirmed.