809 A.2d 353

PROGRESSIVE CASUALTY INSURANCE
COMPANY, Appellant

v.

Blanche M. HOOVER and James E. Hoover, her Husband, Loren J. Druist, Wayne S. Hursh, Marbec Trucking Company, Marvin SenseniG t/d/b/a Marbec Trucking Company, and K.B.S., Inc., Appellees.

Supreme Court of Pennsylvania.

Argued March 4, 2002.

Decided Oct. 25, 2002.

424

Wliiiam R. Tighe, Pittsburgh, Ira S. Lipsius, pro hac vice, New York City, for appellant, Progressive Cas. Ins. Co.

Francis C. Rapp, New Kensigton, for appellants, Blanche M. and James E. Hoover.

Richard Lewis Bushman, Spring Run, for appellee, Marvin Sensenig t/d/b/a Marbec Trucking.

John Thomas Pion, Pittsburgh, for appellee K.B.S., Inc.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION

Justice SAYLOR.

This appeal requires us to consider, for purposes of determining the effect of an interstate commerce endorsement appended to a commercial vehicle liability insurance policy, whether a tractor-trailer was engaged in interstate commerce when it collided with another vehicle.

The accident occurred in November, 1995, in Forward Township, Allegheny County; the tractor-trailer involved was dispatched by Appellee Marbec Trucking Company, leased from Appellee Wayne S. Hursh, and driven by Loren J. Druist. In a civil action commenced in Allegheny County against Marbec, Hursh, Druist, and others, Appellees Blanche M. and James E. Hoover averred that Druist failed to observe a traffic signal, causing the truck to strike the automobile driven by Mrs. Hoover, who sustained serious injuries. Marbec's insurer, Appellant Progressive Casualty Insurance Company, filed the present declaratory judgment action naming the parties to the underlying action as defendants and seeking a judicial determination concerning its obligations under the policy issued to Marbec.

Progressive's base policy covered vehicles scheduled within the declaration pages, which did not include Hursh's truck. Nevertheless, in connection with Marbec's federal certification to conduct interstate operations, the business had also obtained from Progressive an "Endorsement for Motor Carrier Policies of Insurance for Public Liability under Sections 29 and 30 of the Motor Carrier Act of 1980." [1] Commonly referred to as an "MCS–90" or "interstate commerce endorsement," this rider required Progressive to pay a final judgment recovered against its insured "resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the [MCA] regardless of whether or not each motor vehicle is specifically described in the policy." Since Sections 29 and 30

1. P.L. 96–296, 94 Stat. 793 (July 1, 1980) (the "MCA") (amending various provisions interspersed throughout Title 49 of the United States Code).

of the MCA pertained to certain matters involving interstate commerce, *see infra* note 8, the endorsement was therefore implicated in relation to Hursh's truck only to the extent that it was operated, pursuant to the Marbec lease, in furtherance of interstate commerce.

Progressive and the Hoovers filed cross-motions for summary judgment to vindicate their respective views concerning the application of the MCS–90 and, in particular, to resolve whether the shipment at issue was interstate or intrastate in character. According to Progressive, because Hursh's tractor-trailer was transporting its cargo between two points within Pennsylvania, it was necessarily engaged exclusively in intrastate commerce. Appellees' position was that the carriage via Hursh's truck represented merely the final leg of a continuous, interstate shipment, since the truck's contents previously had moved between states. To further contextualize the question, the parties attached to their submissions transcripts from deposition testimony adduced from parties and witnesses.

The cargo involved was distiller's grain, a byproduct of the production of ethanol used as a feed additive for dairy cattle. The shipment derived from an order placed approximately one month prior to the accident by the Pennsylvania Agricultural Commodities Marketing Association, Inc. ("PACMA"), a grain broker,[2] with the Jesse Stewart Co. ("Jesse Stewart"), a grain wholesaler that sells primarily to feed mills in Pennsylvania. PACMA requested to purchase fifteen truckloads of the grain, or approximately 345 tons. Jesse Stewart's usual practice was to wait until it had accumulated enough orders to warrant the purchase of a bargeload (1,000 to 1,500 tons) of distiller's grain, and then arrange for a barge to transport the commodity from the producer's Illinois distillery to a storage facility owned and operated by Clairton Slag in West Elizabeth, Allegheny County, Pennsylvania.[3] There, Clairton Slag un-

---

2. PACMA, formerly a cooperative, is now a privately held merchandiser of grain and feed ingredients, with three rail-to-truck transfer facilities, two warehouses, and a headquarters in Palmyra, Dauphin County, Pennsylvania.

3. Portions of Jesse Stewart's purchases were also based upon predictions about its customer needs or prospective sale in the "spot market."

loaded, stored, and loaded grain onto trucks at Jesse Stewart's expense, with some trucks being commissioned by Jesse Stewart for delivery to its customers and others by the customers themselves. In the case of customers, including PACMA, making their own arrangements for land transportation, title to the grain transferred upon loading at the Clairton Slag facility.

When purchasing quantities of distiller's grain, Jesse Stewart's intention was to have the product move through the storage facility to customers as quickly as possible. A bargeload apparently remained in the facility for seven to fifteen days on average.[4] Although it appears that an order such as that placed by PACMA would aid in prompting Jesse Stewart toward purchasing a bargeload, a representative of the company testified that it would have done so only in the context of an overall buying strategy, not in the sense that the quantity ordered by PACMA could be traced to a particular bargeload (the storage facility could hold approximately one and one-half bargeloads). Moreover, the depositions do not reflect knowledge on the part of Jesse Stewart of the ultimate destination of the relevant portion (one of fifteen truckloads) of the distiller's grain. This destination was Kreider's Feed Mill in Loysville, Perry County, Pennsylvania (PACMA's customer), with PACMA arranging for the transportation with Marbec as the carrier. The timing of the lodging of the order of Kreider's Feed Mill with PACMA is also not clear.[5]

4. A substantial portion of the deposition testimony presented is couched in generalizations and approximations. For example, the seven-to-fifteen day reference derived from the testimony of a Jesse Stewart representative as follows:

> Q: How long generally—you say you want to move [distiller's grain] as quickly as you can—how long generally do bargeloads remain at Clairton Slag from the time that they are off-loaded until they are ultimately transported out?
> A: We load anywhere from one to two barges per month, so they might last, you know, I don't know, anywhere from like 7 to 15 days.
> *See also infra* note 5.

5. A PACMA representative testified that "[g]enerally speaking in the distillers trade [PACMA would] buy four or five loads at a time, and then [would] turn around and sell them as the market—as the need

Based on the above, the common pleas court denied Progressive's motion for summary judgment and granted the Hoovers', noting that even though the route of a shipment may be entirely within a single state (here, West Elizabeth to Loysville, Pennsylvania), the shipment may nevertheless be part of a larger, continuing movement in interstate commerce. *See Texas v. United States,* 866 F.2d 1546, 1553 (5th Cir.1989). The common pleas court explained that whether a particular shipment is interstate or intrastate depends upon the essential character of the commerce—the primary determinant of which is the shipper's fixed, persisting intent at the time of shipment—and that all of the circumstances surrounding the shipment at issue are to be considered in ascertaining the shipper's prevailing intent. *See Century Indem. Co. v. Carlson,* 133 F.3d 591, 595 (8th Cir.1998) (quoting *Roberts v. Levine,* 921 F.2d 804, 812 (8th Cir.1990)). Having implicitly identified Jesse Stewart as the shipper, the common pleas court summarized the facts of the case and concluded that

[clearly] this grain was moving in interstate commerce. When Jesse Stewart purchased the grain from [the producer] in Illinois, its ultimate destination had in large part been predetermined. It would ultimately be shipped to Jesse Stewart's customers at various locations in Pennsylvania based upon preexisting orders. The barge trip from Illinois to West Elizabeth was intended to be only the first leg of shipment. Once the grain was unloaded into the storage facility, it would only remain there briefly until Jesse Stewart's customers picked it up to transport it to the final destinations within Pennsylvania.

Thus, Jesse Stewart clearly intended that the distillers grain would move beyond its storage facilities in West Elizabeth.

Therefore, the common pleas court determined that the MCS–90 applied and, accordingly, directed Progressive to pay any

[arose]." At the time of his deposition, he was unable to provide more specific information with regard to the Kreider's Feed Mill order.

final judgment obtained by the Hoovers against Marbec, up to the policy limits.[6]

On Progressive's appeal, the Superior Court affirmed, applying the same focus as the common pleas court in terms of the essential character of the commerce, the fixed and persisting intent of the shipper, and the totality of the circumstances surrounding the shipment. *See Progressive Cas. Ins. Co. v. Hoover,* 768 A.2d 1157 (Pa.Super.2001). The Superior Court also agreed with the common pleas court's position that Jesse Stewart was the relevant shipper, and Jesse Stewart's intent was to move the grain as far into Pennsylvania as barge transportation would allow, with the understanding that the product's ultimate destination beyond the warehouse had already been determined when PACMA's customers placed their orders. *See Hoover,* 768 A.2d at 1161–62. In response to Progressive's argument that the common pleas court erred in focusing on Jesse Stewart rather than PACMA as the shipper (since title to the distillers grain passed to PACMA in West Elizabeth and PACMA arranged the relevant carriage by Marbec), the Superior Court cited *Middlewest Motor Freight Bureau v. ICC,* 867 F.2d 458 (8th Cir.1989), noting that in that case the court deemed an instance of transportation between two in-state points to have been one leg of an interstate journey without reference to the identity of the shipper for each particular segment. *See Hoover,* 768 A.2d at 1162–63 (citing *Middlewest,* 867 F.2d at 460–61).

The Superior Court also made an assessment of the temporary storage of the distiller's grain at the Clairton Slag facility following its journey from Illinois. In this regard, the court distinguished decisions in which shipments came to rest for manufacturing or processing reasons, *see Hoover,* 768 A.2d at 1161 (citing *National Retail Transp., Inc. v. Pennsylvania Pub. Utility Comm'n,* 109 Pa.Cmwlth. 72, 530 A.2d 987 (1987)), and for maintenance in inventory pending solicitation

---

6. The Hoovers assert that on May 17, 2001, the non-jury trial of the underlying action culminated in verdicts in their favor in the amounts of $854,465 for Mrs. Hoover and $85,000 for Mr. Hoover, and that the verdicts have not been appealed.

of customer orders, *see Hoover*, 768 A.2d at 1161–62 (citing *Pittsburgh–Johnstown–Altoona Express (PJAX), Inc. v. Pennsylvania Pub. Utility Comm'n*, 123 Pa.Cmwlth. 237, 554 A.2d 137 (1989), and *Atlantic Coast Line R.R. v. Standard Oil Co.*, 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270 (1927)), concluding that the brief storage pending retrieval by a pre-designated broker/customer did not disrupt the continuity of the interstate movement. *See Hoover*, 768 A.2d at 1162. The Superior Court acknowledged Progressive's accurate citation to decisions of the former Interstate Commerce Commission (the "ICC"), applying a "two-shipper rule" foreclosing a finding of fixed and persistent intent where multiple shippers are involved in transportation. *See id.* at 1164 (citing *Hays Home Delivery Serv., Inc.*, MC–C–30219, 1994 WL 665958 (ICC Nov. 15, 1994) (articulating the precept that "when the initial shipper (in interstate or foreign commerce) is different from the second shipper (which only distributes the merchandise or products involved within a single State) there can be no fixed and persisting intent, for there is no one shipper in a position to manifest that intent with respect to both legs of the shipment")).[7] It nonetheless found such reasoning to be in

7. The ICC was abolished as of January 1, 1996, via the ICC Termination Act of 1995, P.L. 104–88 109 Stat. 803 (1995), its responsibilities transferred to the Department of Transportation and its newly created Surface Transportation Board, *see id.* at § 201, 109 Stat. at 932–34, and various statutory provisions deriving from the MCA revised and renumbered. Pursuant to a savings provision, however, Congress expressly prescribed that regulations issued by the ICC would "continue in effect according to their terms until modified, terminated, superseded, set aside, or revoked in accordance with law." *Id.* at § 204(a), 109 Stat. at 941; *see Lynch v. Yob*, 95 Ohio St.3d 441, 768 N.E.2d 1158, 1161 & n. 2 (2002). *See generally Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 117 Md.App. 72, 699 A.2d 482, 491–92 (1997) (elaborating on the effects of the ICC Termination Act). While the regulatory scheme has changed substantially since the time of the accident involving the Hoovers, *see generally The Munitions Carriers Conference, Inc. v. United States*, 147 F.3d 1027, 1029 (D.C.Cir.1998), it appears that ICC interpretations retain some continuing validity pursuant to the savings provisions or otherwise. *See generally El Conejo Americano of Texas, Inc. v. Department of Transp.*, 278 F.3d 17, 19 (D.C.Cir.2002) (observing that "[t]he Department of Transportation … recognized, pursuant to [the] savings provision, the continuing legal vitality of ICC decisions; it gave public notice that it interpreted the savings provision to cover all legal documents of the ICC that were issued or granted by an official

conflict with applicable decisions of federal courts and inconsistent with the central focus on the essential character of the transportation. *See Hoover,* 768 A.2d at 1164.

Presently, the parties agree that the determination of whether Progressive's interstate commerce endorsement mandates payment for liability on account of an unscheduled vehicle operated for Marbec depends upon which general regulatory scheme (federal or state) applies to the transportation, and, concomitantly, its interstate versus intrastate character.[8] Both parties recognize the mandatory nature of the interstate commerce endorsement as respects carriers that choose to meet federal financial responsibility requirements for engaging in commercial transportation between states by means of insurance.[9] Further, they acknowledge the salutary

authorized to effect such document' " (citation omitted)). The agency's decisions are pertinent to the present case, of course, since the ICC administered the relevant federal regulatory scheme at the time of the accident.

8. As previously noted, the interstate commerce endorsement applies with regard to vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the MCA, regardless of whether the vehicles are scheduled in a policy. Section 30(a)(1) of the MCA required the Secretary of Transportation to establish regulations mandating minimal levels of financial responsibility pertaining to public liability, property damage, and environmental restoration for commercial, motor transportation conducted on an interstate basis. *See* P.L. 96–296 30(a)(1), 94 Stat. at 820 (codified at 49 U.S.C. § 10927(a)(1) (superseded)).

9. In the MCA, Congress authorized the ICC to promulgate regulations rendering lessee-carriers fully responsible to the public for the operation of the equipment they leased. *See generally Empire,* 868 F.2d at 362; *Rediehs Express, Inc. v. Maple,* 491 N.E.2d 1006, 1010–11 (Ind.Ct. App.1986). In response, the ICC implemented regulations requiring that leases entered into by ICC-licensed carriers contain a provision stating that the authorized carrier maintain "exclusive possession, control, and use of the equipment for the duration of the lease," and "assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 1057.12(c) (superseded). Further, the ICC required that all ICC-certified carriers maintain insurance or other form of surety "conditioned to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance, or use of motor vehicles" under the carrier's permit. 49 C.F.R. § 1043.1 (superseded). The ICC developed the MCS–90 to assure compliance with this requirement, mandating inclusion of the endorsement in

purposes of such requirement, in terms of fostering safety incentives for carriers and protecting against the possibility that, by inadvertence or otherwise, some vehicles may be omitted from a policy, to the detriment of the public. *See* 49 C.F.R. § 387.1. *See generally Adams v. Royal Indem. Co.,* 99 F.3d 964, 968–69 (10th Cir.1996).[10]

Although Progressive thus concedes that the MCS–90 endorsement "cast[s] a wide protective net for the motoring public," it nonetheless emphasizes that such rider does not require an insurer to pay every judgment entered against the motor carrier on whose behalf it is issued. While Progressive acknowledges the common pleas court's determination that Jesse Stewart clearly intended the distillers grain to move beyond its storage facilities in West Elizabeth, it implies that such finding is simply irrelevant given that Jesse Stewart was not the shipper for the West Elizabeth–to–Loysville journey.

insurance policies of carriers who used leased vehicles to transport property under ICC certificate. *See* 49 C.F.R. § 1003.3.

**10.** Under the prior regulatory scheme, in an effort to evade restrictions that accompanied federal regulation, some authorized carriers adopted the practice of leasing equipment from owners who were exempt from such regulation. *See generally American Trucking Ass'ns v. United States,* 344 U.S. 298, 303–04, 73 S.Ct. 307, 311, 97 L.Ed. 337 (1953); *Integral Ins. Co. v. Lawrence Fulbright Trucking, Inc.,* 930 F.2d 258, 261 (2d Cir.1991) (describing the purpose of the MCA and the regulations promulgated under it as "to stem the unregulated use of non-owned vehicles that threatened both public safety and the vitality of the trucking industry"). Such practice, particularly in the form of "trip leasing" (leasing an owner-operator's vehicle for a single trip), was inimical to the protection of the public, as the equipment of these exempt owner-operators was often unsafe and poorly maintained; in addition, regardless of whether the owner-operators had adequate insurance of their own, the agreements with the carrier-lessees designated them as independent contractors, thereby enabling the carrier-lessees to avoid liability arising from accidents in which the leased vehicles were involved. *See Integral,* 930 F.2d at 261; *Empire,* 868 F.2d at 362; *Rediehs,* 491 N.E.2d at 1010.

Thus, as previously noted, the ICC endorsement that is the subject of this appeal had its origin in the ICC's desire that the public be adequately protected where a federally licensed carrier uses a leased vehicle to transport goods pursuant to an ICC certificate. *See generally Rediehs,* 491 N.E.2d at 1011 ("The independent contractor concept has been eliminated for lease arrangements under ICC regulations[;][l]iability of a carrier is fixed as a matter of policy upon the carrier owning operating authority in lease situations[.]").

On the same basis, Progressive discounts the significance of PACMA's apparent knowledge that the product that it ordered was manufactured in another state; when PACMA functioned as a shipper, Progressive contends, its only intent was to move the product from one location in Pennsylvania to another. Progressive maintains that the decisional law, and in particular the decisions of the ICC, reflect the two-shipper rule without exception, and that the ICC, as the agency that was responsible for administering the MCA, is owed deference.

The Hoovers argue that the fixed and persisting intent of both Jesse Stewart and PACMA throughout was to cause the distillers grain to be transported by virtually continuous movement from Peoria, Illinois, to West Elizabeth, Pennsylvania, and from there to the location of PACMA's customer, specifically, Loysville, Pennsylvania. That being the case, the Hoovers contend, it is irrelevant that Jesse Stewart did not arrange the West Elizabeth–to–Loysville leg of the journey, as the ICC's two-shipper rule should not apply where, as here, it is evident that the party in control of the inbound shipment intended from the start that the shipment would move beyond the storage facility in a substantially continuous fashion. According to the Hoovers, therefore, the common pleas court and the Superior Court properly focused on Jesse Stewart's intent as determinative of the interstate character of the transportation. Alternatively, the Hoovers assert that PACMA can be viewed as the initial shipper, since, although it did not directly arrange the inbound shipment of the distillers grain, it set the shipment in motion by placing an order for a specific product that it knew to be manufactured in Illinois, with the intent to have the product transported to Loysville, Pennsylvania.

■ As noted, the MCS–90 endorsement provides that, in consideration of the policy premium, Progressive will pay any final judgment recovered against Marbec for liability resulting from negligence in the operation of motor vehicles *in interstate commerce, regardless of whether the subject vehicle is*

*listed in the policy.*[11] Section 203(a) of the MCA, 49 U.S.C. § 303(a), defines the term "interstate commerce," quite simply, as, *inter alia,* "commerce between any place in a State and any place in another State or between places in the same State through another State...."[12]

Pursuant to the relevant decisional law,[13] the opinions of the Superior Court and the common pleas court properly reflect that transportation of goods within a single state may be deemed "interstate" in character when it forms

11. Parenthetically, we note that, as between the insured and the insurer, all of the policy's terms, conditions, and limitations remain in effect, and the insured agrees to reimburse the insurer "for any payment that the [insurer] would not have been obligated to make ... except for the agreement contained in this endorsement." Accordingly, the MCS–90 endorsement does not constitute insurance coverage *per se. See National Am. Ins. Co. v. Central States Carriers, Inc.,* 785 F.Supp. 793, 795 (D.N.Ind.1992). Rather, in furtherance of the goal of protecting the public, it extends the coverage provided by the insured's policy to any vehicle for which the insured is responsible, regardless of policy exclusions or the lack of active negligence on the part of the insured itself. *See* 49 C.F.R. § 387.1; *Adams,* 99 F.3d at 968; *see also Century Indem.,* 133 F.3d at 594; *Empire,* 868 F.2d at 362–63 ("the ICC endorsement negates any inconsistent limiting provisions in the insurance policy to which it is attached"). With respect to injured third parties, then, the MCS–90 imposes on the insurer an obligation analogous to that of a surety. *See Harco Nat'l Ins. Co. v. Bobac Trucking Inc.,* 107 F.3d 733, 736 (9th Cir.1997).

12. It should be noted that legal questions involving the breadth of interstate commerce arise in many different statutory contexts. *See McLeod v. Threlkeld,* 319 U.S. 491, 495, 63 S.Ct. 1248, 1250, 87 L.Ed. 1538 (1943) ("There is no single concept of interstate commerce which can be applied to every federal statute regulating commerce"); *Federal Trade Comm'n v. Bunte Bros.,* 312 U.S. 349, 351, 61 S.Ct. 580, 582, 85 L.Ed. 881 (1941) (observing that construction of every statute regulating interstate commerce presents "a unique problem in which words derive vitality from the aim and nature of the specific legislation"). *See generally Swift Textiles, Inc. v. Watkins Motor Lines, Inc.,* 799 F.2d 697, 700–01 & n. 2 (11th Cir.1986) (noting various contexts in which the essential-character-of-commerce test arises). Our focus here is on decisions that turn upon the essential nature of the commerce or transportation as the litmus.

13. Federal law governs the operation and effect of ICC-mandated endorsements. *John Deere Ins. Co. v. Nueva,* 229 F.3d 853, 856 (9th Cir.2000), *cert. denied,* 534 U.S. 1127, 122 S.Ct. 1063, 151 L.Ed.2d 967 (2002); *see also Harco Nat'l Ins.,* 107 F.3d at 735; *Canal Ins. Co. v. First Gen. Ins. Co.,* 889 F.2d 604, 610 (5th Cir.1989), *modified on other grounds,* 901 F.2d 45 (5th Cir.1990).

part of a "practical continuity of movement" across state lines from the point of origin to the final destination. *Johnsen v. Allsup's Convenience Stores, Inc.*, 119 N.M. 245, 889 P.2d 853, 857 (Ct.App.1995) (citing *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568, 63 S.Ct. 332, 335, 87 L.Ed. 460 (1943)). As noted, the interstate versus intrastate determination hinges upon an assessment of the essential character of the commerce, manifested by the shipper's fixed and persisting intent at the time of the shipment, and ascertained from all of the circumstances attending the transportation. *See United States v. Erie R.R. Co.*, 280 U.S. 98, 102, 50 S.Ct. 51, 53, 74 L.Ed. 187 (1929). *See generally Swift Textiles*, 799 F.2d at 700–01 (noting that an " 'intent' inquiry ... underlies all modern interstate commerce analysis"). Relevant circumstances include, in particular, the presence (or absence) of certain indicia of "through carriage" such as through billing; storage-in-transit tariff provisions; uninterrupted movement; continuous possession by the carrier; unbroken bulk; and absence of processing or substantial product modification. *See Texas v. United States*, 866 F.2d at 1556; *Georgia Textile Mach., Inc. v. Federal Express Corp.*, 252 Ga.App. 594, 556 S.E.2d 845, 849–50 (2001). Courts frequently caution, however, that no particular factor is, in and of itself, determinative.[14] The determination is, instead, to be based upon the practical realities of the transportation at issue. *See Northwest Terminal Elevator Ass'n v. Minnesota Pub. Util. Comm'n*, 576 F.Supp. 22, 25 (D.Minn.1983) (citing *Swift & Co. v. United States*, 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518 (1905)), *aff'd*, 725 F.2d 80 (8th Cir.1984).

**14.** *See Texas & New Orleans R.R. Co. v. Sabine Tram Co.*, 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442 (1913) (observing that a shipment's "mere accidents," such as bills of lading or passage of title, are not controlling); *see also Swift Textiles*, 799 F.2d at 699. *See generally North Carolina Utilities Comm'n v. United States*, 253 F.Supp. 930, 934 (E.D.N.C.1966) ("The general import of the decisions is that isolated factors are themselves not controlling, but that enough single factors added together to manifest an overall intent that goods be shipped in interstate or foreign commerce will bring the commerce within the federal domain."); *United States v. Majure*, 162 F.Supp. 594, 598 (S.D.Miss.1957) ("The intent of the shipper is to be ascertained from the 'bundle of circumstances' that surrounds the movement.").

While these guiding principles are readily stated, their application has proved to be less straightforward.[15] Indeed, during its tenure, the ICC attempted to reformulate the relevant test on multiple occasions.[16]

In a substantial line of decisions, courts and regulators have considered whether two phases of transportation, one which crosses state borders and another that does not, should be regarded as a single, interstate venture, or as comprised of separate interstate and intrastate components. In many of these cases, the intrastate leg occurs first, for example, where a seller transports his goods to a port or other distribution point for export.[17] The seminal decision of the United States

15. *See generally Kreider Truck Service, Inc. v. Augustine,* 76 Ill.2d 535, 31 Ill.Dec. 802, 394 N.E.2d 1179, 1181–82 (1979) ("The problems confronted in determining whether an activity constitutes interstate or intrastate commerce are ... perplexing ... and produce uncertainty[.]"); *Texas v. United States,* 866 F.2d at 1548 ("Shippers, truckers, state regulators, and federal agencies have litigated ... wrangles over 'hub-and-spoke' distribution systems for at least sixty years." (citations omitted)); *Webb v. Athens Newspapers, Inc.,* 999 F.Supp. 1464, 1471 (M.D.Ga.1998) ("subtle factual differences highlight how slender is the reed on which the applicability of [an exemption pertaining to truckers engaged in interstate commerce] may at times rest"); *Policy Statement—Motor Carrier Interstate Transportation—From Out–Of–State Through Warehouses to Points In Same State,* 8 I.C.C. 470, 473–74 (1992) (noting that "challenges [to ICC jurisdiction] persist despite an unbroken string of Commission, Federal Court and Supreme Court decisions explaining the difference between interstate and intrastate trucking services provided within a single State").

16. *Compare, e.g., Ex Parte No. MC–48, Determination of Jurisdiction Over Transportation of Petroleum Products Transported Within A Single State,* 71 M.C.C. 17 (1957) (citing as primary manifestations of a shipper's intent: the absence of a specific order being filled for a specific quantity at the time of the shipment; the character of the terminal storage facility as a distribution point or local marketing facility; and the arrangement of further transportation only after sale or allocation from storage), *with Policy Statement,* 8 I.C.C. at 473–74 (reimplementing a totality evaluation and enumerating salient factors). *See generally Roberts,* 921 F.2d at 811–12; *California Trucking Ass'n v. ICC,* 900 F.2d 208, 212 (9th Cir.1990) ("The agency appears to have recharacterized the applicable test").

17. *See, e.g., Champlain Realty Co. v. Town of Brattleboro, Vt.,* 260 U.S. 366, 43 S.Ct. 146, 67 L.Ed. 309 (1922); *Sabine,* 227 U.S. at 111, 33 S.Ct. at 229; *Ohio RR. Com'n v. Worthington,* 225 U.S. 101, 32 S.Ct. 653, 56 L.Ed. 1004 (1912); *Century Indem.,* 133 F.3d at 591; *Burlington Northern, Inc. v. Weyerhaeuser Co.,* 719 F.2d 304 (9th Cir.1983);

Supreme Court in *Sabine,* 227 U.S. at 112, 33 S.Ct. at 229, is illustrative, as it concerns shipments made to the seaboard for export, holding that such shipments were to be treated as residing in foreign commerce from the time that their movement to their foreign destination commenced, and that the character of the shipment was not affected by such incidents of transportation as intrastate billing, reconsignment, reshipment at port, or processing in transit. *See id.* at 127, 33 S.Ct. at 234.[18]

Although the front-end cases yield differing results depending upon the particular facts and circumstances involved, courts and regulators have remained especially circumspect in cases in which the intrastate leg of the transportation occurs after interstate travel followed by some pause in the voyage, for example, at a warehouse or distribution point.[19]   For

*Southern Pacific Transp. v. ICC,* 565 F.2d 615 (9th Cir.1977); *State Corp. Comm'n v. Bartlett and Co., Grain,* 338 F.2d 495 (10th Cir.1964); *ICC v. Columbus and G. Ry. Co.,* 153 F.2d 194 (5th Cir.1946); *Texas v. Anderson, Clayton & Co.,* 92 F.2d 104 (5th Cir.1937); *Northwest Terminal,* 576 F.Supp. at 22; *Farmers Union Cooperative Marketing Ass'n v. State Corp. Comm'n,* 302 F.Supp. 778 (D.Kan.1969); *Dallum v. Farmers Co-operative Trucking Ass'n,* 46 F.Supp. 785 (D.Minn.1942); *State v. Roberts,* 344 N.W.2d 407 (Minn.1984); *State v. Berg,* 106 Ohio App.3d 596, 666 N.E.2d 646 (1995).

18. *See also Champlain Realty,* 260 U.S. at 376–77, 43 S.Ct. at 149; *Worthington,* 225 U.S. at 111, 32 S.Ct. at 657; *Anderson, Clayton,* 92 F.2d at 107; *Northwest Terminal,* 576 F.Supp. at 25 (describing transportation of grain from country elevators to river terminals in Minnesota as the "first leg of a large and constantly recurring course of interstate commerce"); *Bartlett,* 338 F.2d at 498–99; *Farmers Union Cooperative,* 302 F.Supp. at 784; *Dallum,* 46 F.Supp. at 788 ("The movements of the goods by the defendant and other carriers was [sic] done in the performance of a preconceived intention to transport said goods to interstate destinations."); *Roberts,* 344 N.W.2d at 410–11. *But see Coe v. Errol,* 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715 (1886); *Burlington Northern,* 719 F.2d at 310; *Southern Pacific Transp.,* 565 F.2d at 621; *Columbus and G. Ry.,* 153 F.2d at 196.

19. *See, e.g., Atlantic Coast Line,* 275 U.S. at 257, 48 S.Ct. at 107; *Merchants Fast Motor Lines v. ICC,* 5 F.3d 911 (5th Cir.1993); *Roberts,* 921 F.2d at 804; *California Trucking,* 900 F.2d at 208; *Middlewest,* 867 F.2d at 458; *Texas v. United States,* 866 F.2d at 1546; *Swift Textiles,* 799 F.2d at 697; *Baird v. Wagoner Transp. Co.,* 425 F.2d 407 (6th Cir.1970); *Galbreath v. Gulf Oil,* 413 F.2d 941 (5th Cir.1969); *Long Beach Banana Distributors v. Atchison, Topeka & Santa Fe Railway Co.,*

example, in an early decision, the United States Supreme Court expressed the following *dictum* regarding such "back-end" cases:

The mere fact that cars received on interstate movement are reshipped by the consignee, after a brief interval, to another point, does not, of course, establish an essential continuity of movement to the latter point. The reshipment, although immediate, may be an independent intrastate movement. The instances are many where a local shipment follows quickly upon an interstate shipment and yet is not to be deemed part of it, even though some further shipment was contemplated when the original movement began. Shipments to and from distributing points often present this situation, if the applicable tariffs do not confer reconsignment or transit privileges.

*Baltimore & Ohio South–Western Railroad Co. v. Settle*, 260 U.S. 166, 173–74, 43 S.Ct. 28, 31, 67 L.Ed. 189 (1922). A particular concern has been expressed that carriers should not be subject to unreasonable uncertainties in identification of the character of a shipment and, correspondingly, the controlling regulatory framework.[20] Moreover, the ICC had noted that shipments from a distribution point following an interstate movement are often deemed a separate intrastate movement if the applicable tariffs do not confer reconsignment or transit privileges. *See Armstrong World Indus., Inc.*, 2 I.C.C.2d 63, 69 (1986), *aff'd, State of Texas v. I.C.C.*, 866 F.2d at 1546; *see*

407 F.2d 1173 (9th Cir.1969); *Shew v. Southland Corp.*, 370 F.2d 376 (5th Cir.1966); *Johnsen*, 889 P.2d at 853.

**20.** For example, in *Gulf, Colorado & Santa Fe Railway Co. v. Texas*, 204 U.S. 403, 27 S.Ct. 360, 51 L.Ed. 540 (1907), the Supreme Court stated:

In many cases it would work the grossest injustice to a carrier if it could not rely on the contract of shipment it has made, know whether it was bound to obey the state or Federal law, or, obeying the former, find itself mulcted in penalties for not obeying the law of the other jurisdiction, simply because the shipper intended a transportation beyond that specified in the contract. It must be remembered that there is no presumption that a transportation when commenced is to be continued beyond the state limits, and the carrier ought to be able to depend upon the contract which it has made, and must conform to the liability imposed by that contract.

*Id.* at 414, 27 S.Ct. at 363.

*also Boyd v. United States,* 275 F. 16, 18 (4th Cir.1921) ("When goods moving in interstate commerce reach their ultimate destination, and are reconsigned from that destination on a new contract of shipment to some other point in the same state, the last movement is not interstate." (citations omitted)); *Frito–Lay, Inc. v. Wisconsin Labor and Indus. Review Comm'n,* 95 Wis.2d 395, 290 N.W.2d 551, 556–57 (Ct.App.1980), *aff'd,* 101 Wis.2d 169, 303 N.W.2d 668 (1981). Indeed, in a number of earlier cases in which back-leg transportation within a single state was deemed part of a larger interstate movement there were elements of fraud or subterfuge on the part of a shipper or carrier attempting to manipulate tariff rates or regulation. *See, e.g., Settle,* 260 U.S. at 173–74, 43 S.Ct. at 31 (refusing to find that a pause in transportation destroyed its interstate character, where the shipper admitted that the stoppage was solely for the purpose of taking advantage of local tariff rates). *See generally Rush Common Carrier Application,* 17 M.C.C. 661, 677 (1939) (citing cases).

Nevertheless, in applying the essential character of the commerce assessment, with particular emphasis on the shipper's fixed and persisting intent, back-end situations are sometimes deemed to entail interstate transportation in the absence of misconduct. *See, e.g., Jacksonville Paper,* 317 U.S. at 568, 63 S.Ct. at 335 ("The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey[;][a] temporary pause in their transit does not mean they are no longer 'in commerce' within the meaning of the Act."). While generalizations in this arena are likely to be misleading, the placement of orders of the ultimate customer on a pre-shipment versus post-arrival basis is frequently referenced as a substantial factor in distinguishing interstate from intrastate commerce situations. *See Murray v. Briggs,* 569 So.2d 476, 480 (Fla.App. 5 Dist.1990) ("Unquestionably, a factor to take into account in determining the 'fixed and persisting intent' of the shipper is whether, at the time the transportation commenced, a specific interstate destination for

the shipment was definitely planned." (citations omitted)).[21]
Along these lines, one court offered the following assessment:

As a practical matter of business, any time a shipper moves
products to a terminal his ultimate intent is that they be
distributed among various consumers at various consuming
points. If this is the only intention, the interstate journey
ordinarily ends at the terminal. However, if, at the time he
moves products to a terminal his present intention is that
they merely be put through the terminal on their way to
specific consumers at specific consuming points the inter-
state journey does not end until the products reach those
consumers at those points.

*Majure*, 162 F.Supp. at 601 (finding unitary interstate trans-
portation in a single-shipper, back-end paradigm involving
through movement to specific consuming points to be inter-
state); *see also Beggs*, 167 F.2d at 704 (holding that ware-
house distributions to company-owned stores constituted inter-
state commerce, since, *inter alia*, the company knew at the
time out-of-state shipments to the warehouse commenced that
the shipments were bound for its retail stores); *Shew*, 370
F.2d at 380–81 (finding interstate commerce in the case of

**21.** *Compare Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1470 (9th Cir.1997);
*Shew*, 370 F.2d at 378, 380 (holding shipments from a distribution
point supplied by out-of-state shipments made pursuant to preexisting
orders were interstate in character); *Beggs v. Kroger Co.*, 167 F.2d 700,
703 (8th Cir.1948) (holding that interstate shipments to a ware-
house/distribution point through to same-state retail outlets retained
their interstate character, where the warehouse "was merely a conve-
nient instrumentality for the division of the shipments coming to it and
the continuation of the movement of each part to the retail stores");
*Georgia Textile*, 556 S.E.2d at 850 ("Delivery of goods to customers is
often a multi-step process involving temporary interruptions, and the
simple fact that the transit is temporarily interrupted does not mean
that the shipment is no longer part of a 'continuous movement.'"
(citation omitted)); *Johnsen*, 889 P.2d at 859 ("if the halt in the
movement of goods is a convenient intermediate step in the process of
getting them to their final destination, they remain in commerce until
they reach it"); *Berg*, 666 N.E.2d at 646; *Murray*, 569 So.2d at 480
(transportation of "inventory items to customers is usually not consid-
ered 'interstate commerce' for purposes of the MCA"), *with Atlantic
Coast Line*, 275 U.S. at 268, 48 S.Ct. at 110 (holding that intrastate
transportation of imported oil from coastal storage facilities to bulk
stations constituted intrastate commerce).

shipments from a company distribution point supplied by out-of-state shipments made pursuant to preexisting orders from company branches).[22]

The jurisprudence of the former ICC also embodied a two-shipper rule, as Progressive emphasizes, requiring that fixed and persistent intent be found lacking in certain instances in which multiple shippers are involved in transportation.[23] While Progressive contends that such precept is absolute, perspective on this claim may be gained by examining its derivation from the decision of the United States Supreme Court in *Atlantic Coast Line*, 275 U.S. at 257, 48 S.Ct. at 107.[24]

22. Corollary to its two-shipper rule, discussed further *infra*, the ICC has expressed the view that this factor is less significant in cases in which the initial shipper controls the purchase, shipment, and sale of the goods throughout. *See May Dep't Stores Co. & Volume Shoe Corp.*, MC–C–30146, 1990 WL 287520 (I.C.C. June 7, 1990), *cited in Roberts*, 921 F.2d at 813–14 (citing additional ICC decisions). *Accord Texas v. United States*, 866 F.2d at 1556–57 (distinguishing between cases involving through arrangements and those that do not in terms of the importance of the shipper's knowledge of the ultimate destination). Moreover, knowledge of a specific destination at the outset of the transportation also has assumed lesser significance in the front-end cases. *See, e.g., Sabine*, 227 U.S. at 126, 33 S.Ct. at 234 (finding it of no consequence that the original shipper had no knowledge of its goods once they had been delivered to a port for export); *Century Indemnity*, at 598–99 (same); *Northwest Terminal*, 576 F.Supp. at 31; *Roberts*, 344 N.W.2d at 410 ("The determining circumstance is that the shipment of the lumber to [a port for export] was but a step in its transportation to its real and ultimate destination in foreign countries." (quoting *Sabine*, 227 U.S. at 126, 33 S.Ct. at 234)). *See generally Murray*, 569 So.2d at 478–79 ("Different factors may be important in certain types of cases but not in others." (citation omitted)).

23. Black's Law Dictionary defines a "shipper" as:
[o]ne who engages the services of a carrier of goods. One who tenders goods to a carrier for transportation; a consignor. The owner or person for whose account the carriage of goods is undertaken.
BLACK'S LAW DICTIONARY 1378 (6th ed.1990).

24. *See Hays*, MC–C–30219, 1994 WL 665958, at *3–4 (citing *Atlantic Coast Line* in support of the two-shipper rule); *Advantage Tank Lines, Inc.*, 10 I.C.C.2d 64, 74 & n. 10 (1994) (same); *Association of Texas Warehousemen*, 8 I.C.C.2d 476, 489 (1992) (same); *Pittsburgh–Johnstown–Altoona Express (PJAX), Inc.*, 8 I.C.C.2d 821, 833 & n. 10 (1990) (same); *Pacific Coast Bldg. Prod., Inc.*, MC–C–30121, 1989 WL 237806, at *3 (ICC Jan. 6, 1989) (same); *Ottawa Strong & Strong, Inc. v. Tobler*

This case involved the transportation of petroleum products by tank steamer from refineries in Louisiana and Mexico, owned by sellers, to storage facilities owned by a buyer at several locations on the Florida coast. *See id.* at 261–66, 48 S.Ct. at 108–09. The steamers were owned and chartered by the seller; the buyer took title to the products upon delivery. The products remained in the storage terminals until, on the basis of consumer demand, the buyer shipped them to bulk stations throughout the state by means of tank cars that it leased and hauled by a railroad company over its lines. When the railroad company began charging for the in-state shipments at interstate rates, which were higher than the intrastate rates previously charged, on the ground that such shipments were a continuation of the flow of interstate commerce, the buyer sought to enjoin it from doing so. *See id.*

The Supreme Court agreed with the buyer that the in-state shipments were intrastate in character. *See Atlantic Coast Line,* 275 U.S. at 267, 48 S.Ct. at 110. In the course of its analysis, the Court emphasized that a reshipment of an interstate shipment could constitute interstate or intrastate commerce, and that determining the character of such a reshipment required "weighing the whole group of facts in respect to it." *Id.* at 268–69, 48 S.Ct. at 110. The "important controlling fact," according to the Court, was that the buyer's "whole plan" was to have its oil purchases delivered to the seaboard storage facilities to await "convenient distribution" within the state; the buyer did not need or intend to ship the oil to the bulk stations "by immediate continuity of transportation." *See id.* at 269, 48 S.Ct. at 110–11. The Court explained that the seaboard facilities were the natural place for a change from interstate to intrastate transportation to occur, and that nothing in the history of the transaction militated against such a change. The sellers intended to transport the oil products no

*Transfer, Inc.,* MC–C–30076, 1989 WL 238107, at *8 (I.C.C. Mar. 1, 1989); *Quaker Oats Co.,* 251 F.3d 170, 4 I.C.C.2d 1033, 1048–49 (1987) (explicating the view that, in *Atlantic Coast Line,* "[t]he involvement of two separate shippers—the first to point of temporary storage, the second from the point of temporary storage—broke the continuity of the movement"), *aff'd, California Trucking,* 900 F.2d 208.

farther than the seaboard storage facilities, the Court noted, and neither they nor the railroad played any part in determining the ultimate destinations of the products. *See id.* at 269, 48 S.Ct. at 111.

Thus, the *Atlantic Coast Line* Court did not indicate that it was establishing an inflexible two-shipper principle, but rather, reemphasized that ascertaining the character of a particular shipment requires careful examination of all of the surrounding circumstances. *See generally Roberts v. Levine,* 921 F.2d 804 at 814 (reiterating that "to focus on any one fact would violate [the essential-character-of-commerce] standard"). Moreover, while Progressive asserts that the ICC applied the two-shipper rule absolutely, the ICC announced that the rule is subject to express exception in the primary decision that Progressive cites, *Hays Home Delivery.* There, the ICC indicated that its two-shipper rationale:

> does not apply if the initial shipper identifies (or addresses) the merchandise for a particular, ultimate consignee. Then the requisite fixed and persisting intent is manifest at the time of the initial shipment, and the transportation remains interstate or foreign commerce at least until the merchandise is delivered to that identified consignee.

*Hays Home Delivery,* 1994 WL 665958, at *5 n. 6. Such exception appears to derive from and is consistent with the necessary focus on the essential character of the commerce and practical realities, suggesting that the ICC itself did not intended to dispense with a totality assessment in all cases involving two shippers. *Accord Swift Textiles,* 799 F.2d at 699 ("The nature of a shipment is not determined . . . by when and to whom title passes"); *Roberts,* 344 N.W.2d at 410 (recognizing that "the intent element is to be gleaned from all the surrounding facts and testimony and not solely from the subjective intent of the original shipper"). Further, contrary to Progressive's contention, federal courts have in fact not applied the rule universally. *See, e.g., Klitzke,* 110 F.3d at 1470 (following *Jacksonville Paper* in holding that "even though the [initial] shippers did not know the goods' ultimate destinations, the orders were placed and the goods were

shipped to satisfy contracts between [the second shipper] and its customers that specified a final place of delivery within Oregon *other than the [second shipper's] warehouse*" (emphasis in original)).[25]   Indeed, invariable application of the two-shipper rule would facilitate potential abuses in a manner analogous to the practice of trip leasing bred under the prior regulatory scheme.   *See supra* note 10.   *See generally Hoover,* 768 A.2d at 1164 (observing that to apply the two-shipper rule in the present circumstances "would be to permit buyers and sellers to change the nature of interstate commerce by merely changing shippers in mid-stream").

■   Accordingly, and at least in absence of a specific indication to the contrary by the present federal regulators,[26] we will not apply the former ICC's two-shipper rule in a talismanic fashion.   Rather, we read the cases as requiring transportation to be deemed non-continuous in the two-shipper, back-end paradigm in absence of indicia akin to storage-in-transit tariff provisions, reconsignment privileges, or other strong indicia of a contrary intent on the part of the shipper arising from the outset of the transportation.   *Accord Texas v. United States,* 866 F.2d at 1557; *Swift Textiles,* 799 F.2d at 701 (concluding that "[i]t is irrelevant that the foreign and domestic legs of the voyage are effected by different shippers or carriers" where "a shipment of foreign goods is sent to the United States *with the intention that it come to rest at a specific destination beyond its port of discharge*" (emphasis added)); *cf. Georgia Textile,* 556 S.E.2d at 849–50 (noting in a one-shipper, back-end case that, even in absence of concrete indicia of a through shipment, "the movement of the goods may be continuous even in the absence of such incidents where

**25.**   According to our review, in the cases in which the rule has not been followed there have been other particularly strong factors favoring the interstate commerce determination.   *See, e.g., Webb,* 999 F.Supp. at 1472 (finding non-fungible character of goods to constitute the strongest evidence of the shipper's fixed and persisting intent in the circumstances presented in a back-end, two-shipper case).

**26.**   The record does not reflect that any party has sought to invoke primary jurisdiction of the present federal regulators with respect to the instant controversy.   *See generally Central Freight,* 899 F.2d at 417 (discussing the doctrine of primary jurisdiction in the interstate commerce context); *Middlewest,* 867 F.2d at 459 (same).

it is admitted that a shipment made to the ultimate destination had at all times been so intended").[27] Obviously the challenge facing the regulators was to implement the public policy underlying the MCA, while at the same time imposing some framework facilitating greater certainty in an arena necessarily governed by *ad hoc* totality assessments. Certainly, the ICC's efforts in this regard were reasonable, and are entitled to our respect. *See generally supra* note 7.

■ The present circumstances involve a two-shipper, back-end paradigm in which no evidence has been presented that is akin to storage-in-transit tariff provisions or reconsignment privileges. The proofs offered by the Hoovers are lacking in material regards, including in terms of Jesse Stewart's (the initial shipper's) awareness at the outset of the transportation that a portion of the distiller's grain was bound for its ultimate destination, Kreider's Feed Mill in Loysville, *see generally Roberts*, 921 F.2d at 810–11 (distinguishing *Atlantic Coast Line* on the basis that it was a two-shipper case, in which the initial shipper had no involvement with determining the commodity's ultimate destination), or PACMA's receipt of a specific order from Kreider's Feed Mill at or prior to such time.[28] While certainly the common pleas court and the Superior Court were able to identify a number of uncontested factors that militate in favor of their determinations, *see supra*, we

27. As noted, in front-end cases, courts seem to attach lesser significance to the presence of multiple shippers. *See supra* note 22. *But see Burlington Northern*, 719 F.2d at 308–10.

28. Due to PACMA's identity as a commercial broker, its involvement from the outset of the transportation, and Jesse Stewart's knowledge of PACMA's involvement and trade from the outset, evidence of PACMA's knowledge of an ultimate destination as of the time that the transportation commenced in Illinois would serve as a close substitute for knowledge of the initial shipper of an ultimate destination. *See generally Farmers Cooperative*, 302 F.Supp. at 782–84 (discussing the question of whose intent is properly at issue and concluding that "[t]he authorities on this subject say nothing to indicate that the 'continuing intent' must be that of the party having control of the shipment at any particular point in its movement, nor do they limit the scope of this concept to the elemental motivating factors behind the acts of each of the initiating parties."); *Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 641 (Tex.1989) (emphasizing fixed and persisting intent of the shipper, "or others for whose benefit the shipment is made").

find that the material gaps in the deposition testimony presented, viewed in the light most favorable to Progressive as the non-moving party, *see Manzetti v. Mercy Hosp. of Pittsburgh*, 565 Pa. 471, 482, 776 A.2d 938, 944 (2001) (articulating the applicable summary judgment standard), control, as they implicate both the potential for a dispute regarding material factual details and a deficiency in the Hoovers' present proofs as assessed according to the applicable authorities. Such deficiency is particularly apparent on review of the painstaking detail evaluated by federal courts in effectuating the essential character of commerce assessment. *Compare, e.g., Roberts*, 921 F.2d at 806–09, *with supra* notes 4–5. In our review, we have found no precedent, in a two-shipper case, for rendering a matter-of-law declaration of continuous transportation in analogous circumstances.[29]

**29.** The Superior Court's citation to *Middlewest*, 867 F.2d at 458, would appear to be the decision most favorable to Appellees' position, as it appears to involve a back-end paradigm, in which the ICC found the relevant transportation to be part of continuous interstate transportation. Nevertheless, it is not clear from the decision that two shippers were involved, and, indeed, there are indicia to the contrary in the underlying decision of the ICC. *See, e.g., Matlack, Inc.*, No. MC–C–10999, 1989 WL 98610, at *4 (I.C.C. June 1, 1987) (concluding that "[h]ere, the record demonstrates that [the shipper's] intent is to ship not to [its distribution terminal] but to its customers"), *aff'd, Middlewest*, 867 F.2d at 458. Moreover, the circumstances entailed a situation in which "the vast majority of shipments involve[d] supply contracts and other sales arrangements entered into prior to the shipment, [such that the shipper] knows, in almost all cases, the final destination from the moment the shipment leaves its out-of-state origin." *Matlack*, 1989 WL 98610, at *4; *see also id.* at *5 (contrasting *Atlantic Coast Line* on the ground that "[h]ere, by contrast, it is clear that [the shipper] intends the chemicals to continue their movement through the storage facilities for delivery to known customers"). In this case, the circumstances involve consignment to an intermediary broker, PACMA, with no demonstrated knowledge on the part of Jesse Stewart or PACMA of the ultimate destination as of the commencement of the shipment at its out-of-state origin in Illinois.

*Central Freight*, also cited by Appellees, is not directly on point, since it is a single-shipper case, and involved the use of storage-in-transit provisions. *See Central Freight*, 899 F.2d at 420 ("A storage-in-transit tariff may effectively convert what would otherwise be a separate movement into part of a through interstate movement by tying movements together into a continuing service." (citations omitted)). Indeed, *Central Freight* expressly distinguished, in terms of their interversus

While we conclude that the common pleas court erred in granting summary judgment in the Hoovers' favor, we discern no error in the common pleas court's refusal to enter judgment for Progressive on the record presented. Significantly, in its summary judgment submissions made to the common pleas court, Progressive did not identify the controlling standard in terms of the essential character of the commerce measured with reference to the shipper's fixed and persisting intent and assert an insufficiency of the Hoovers' proofs in this regard. Rather, Progressive merely argued that, since it was undisputed that the shipment via Hursh's truck occurred entirely within Pennsylvania, the MCS–90 was inapplicable as a matter of law. *See* R.R. at 496a–515a. As elaborated above, however, this analysis is misleading in its failure to confront the controlling question of whether and to what degree the interstate and intrastate phases of the transportation of the distiller's grain should be deemed interrelated within the well-established framework for such inquiry. Since, just as the record presented does not establish that the movement of distiller's grain was continuous, it also does not definitively establish non-continuous transportation, Progressive's motion was properly denied on the merits of the argument presented.

In summary, we find the record presented insufficient to establish, as a matter of law, the character of the shipment via Hursh's truck. Accordingly, the order of the Superior Court is reversed and the matter remanded to the common pleas court for further proceedings consistent with this opinion.

Chief Justice ZAPPALA concurs in the result.

---

intrastate character, shipments picked up by the shipper's designated carrier from those concerning which transportation is arranged by customers themselves. *See Central Freight*, 899 F.2d at 422.