**HUDSON TRANSPORTATION COMPANY, Plaintiff,**

v.

**The UNITED STATES of America and the Interstate Commerce Commission, Defendants.**

**Pennsylvania Public Utility Commission, Intervening Defendant.**

**ARROW CARRIER CORPORATION, Plaintiff,**

v.

**The UNITED STATES of America and the Interstate Commerce Commission, Defendants.**

**Pennsylvania Public Utility Commission, Intervening Defendant.**

Civ. A. Nos. 362–62, 306–62.

United States District Court
D. New Jersey.
June 14, 1963.

August W. Heckman, Jersey City, N. J., for plaintiff Hudson Transp. Co.

Evans, Hand, Evans, Allabough & Amoresano, Paterson, N. J., for plaintiff Arrow Carrier Corp.

David M. Satz, Jr., U. S. Atty., Newark, N. J., Lee Loevinger, Asst. Atty. Gen., and John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., for defendant, United States.

Robert W. Ginnane, Gen. Counsel, and H. Neil Garson, Assoc. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for defendant, Interstate Commerce Commission.

William A. Goichman, Asst. Counsel, Commonwealth of Pennsylvania, Harrisburg, Pa., for intervening defendant Pennsylvania Public Utility Comm.

John R. Sailer, Elizabeth, N. J., for intervening defendants Highway Express Lines, Inc., Rodgers Motor Lines, Inc., Fowler & Williams, Inc., and Modern Transfer Co.

Lum Biunno & Tompkins, Newark, N. J., for intervening defendant Pennsylvania R. Co.

Before McLAUGHLIN, Circuit Judge, and WORTENDYKE and LANE, District Judges.

McLAUGHLIN, Circuit Judge.

These are separate suits by unrelated parties brought under 28 U.S.C. § 1336 to set aside orders of the Interstate Commerce Commission. Because they involved similar issues the proceedings before the Interstate Commerce Commission were heard on a consolidated record, with the Examiner filing a single report and recommended order regarding them. They were reconsidered by Division One of the Interstate Commerce Commission which filed a consolidated report thereon. Thereafter the Commission reviewed the proceedings and disposed of them in one report and order. The cases were consolidated for hearing in this court and heard March 8, 1963.

The causes came to the Interstate Commerce Commission (I.C.C.) first, through the filing of petitions by both present plaintiffs asking for declaratory orders that they are authorized by the I.C.C., inter alia, to conduct operations between Pennsylvania origin points and Penn-

sylvania destination points over their certificated interstate routes traversing New Jersey and second, through complaints filed by the Pennsylvania Public Utility Commission (P.U.C.) charging that the plaintiffs are motor carriers holding certain authorities issued by the I.C.C. and subject to the provisions of the I.C.C. Act; that they have transported property by motor vehicle between certain points in Pennsylvania over routes through points in New Jersey, without first having obtained appropriate certificates of public convenience and necessity from the I.C.C. as required by Sections 203(c) and 206(a) (1) of the I.C.C. Act or having obtained a certificate from P.U.C. as required by Sections 202(b) and 202(c) of the Public Utility Law of Pennsylvania.

Following the hearing before the Examiner the latter filed his recommended report and order. In that he found that the challenged operations of the present plaintiffs between points in Pennsylvania through points in New Jersey, in the transportation of property both originating and terminating at points within Pennsylvania were not authorized by their certificates, that they were engaged in that traffic without proper authority and in violation of the I.C.C. Act, § 206(a) (1) and that an order should be entered requiring each defendant to cease and desist from all such operations. It was also recommended that present plaintiffs' petitions above mentioned be denied.

Division One after reconsideration of the issues concluded that the disputed operations of Hudson and Arrow were, but for their routing, actually intrastate commerce and holding that the carriers' petitions to the extent they sought an interpretation to the contrary, should be denied. There was the further holding that said operations were authorized by the carriers' certificates and that the complaints in so far as they embraced those activities be dismissed. The Division went on to say:

"No logical reason appears for the present routing of the intrastate freight other than the fact that defendants are without intrastate authority to transport it; and from the record, it fairly appears that the only reason for such routing is so that Hudson and Arrow may participate in intrastate traffic purportedly under rights arising from certificates issued by this Commission. All things considered, we are convinced that both Hudson and Arrow have, in their respective operations hereinabove described, by which they have transported freight moving between Pennsylvania points without a prior or subsequent interstate movement, attempted in bad faith to convert, to interstate traffic, traffic which, but for routing, is actually in intrastate commerce subject to the laws of Pennsylvania.

"We do not believe, however, that an order directed against such intrastate transportation would be appropriate in these proceedings, inasmuch as we have no jurisdiction over intrastate commerce and the physical operations involved, as actually conducted, violate no provision of the Interstate Commerce Act."

Though the Division concluded, as stated in the paragraph just above, that an order directed against the particular type of transportation would not be appropriate in the proceedings and so to that extent should be dismissed, it did specifically find that:

"(2) that the challenged operations by defendants between the points in Pennsylvania involved, through points in New Jersey, in the transportation of property both originating and terminating at points within Pennsylvania are, but for their routing, in intrastate commerce inasmuch as they are conducted as a subterfuge to evade the laws of Pennsylvania; * * *."

On reconsideration, the Commission stated in its report:

"We are convinced that in the absence of regulation by the Common-

wealth of Pennsylvania both defendants would use the normal and direct routes between the Pennsylvania points they hold themselves out to serve. We are satisfied, as were division 1 and the examiner, that in the transportation of freight moving between Pennsylvania points without a prior or subsequent interstate movement, the defendants have attempted in bad faith to convert what is essentially intrastate commerce into interstate commerce and thus to defeat the regulatory laws and policies of the Commonwealth of Pennsylvania. In other words, this is a case of subterfuge, pure and simple."

and held:

"On reconsideration in Nos. MC–C–267 and MC–C–2696, we find (1) that the described operations by defendants between points in Pennsylvania through points in New Jersey in the transportation of property originating or terminating at points without Pennsylvania are authorized by the respective defendants'.certificates; and (2) that the described operations by defendants between the involved points in Pennsylvania, through points in New Jersey, which transportation of property originates and terminates within Pennsylvania, are, but for their routing, in intrastate commerce inasmuch as they are conducted as a subterfuge to evade the laws of Pennsylvania and they are not authorized by their respective certificates; and (3) that an order should be entered requiring each defendant to cease and desist, and hereafter abstain from holding themselves out or performing, under certificates issued by this Commission, all operations herein found to be, in effect, intrastate in character.

"In Nos. MC–113933, MC–71536, and MC–71536, subnumbers 1, 2 and 3, we find on reconsideration that the matters to which the petitions are directed have been disposed of in the findings above and the petitions thus should be denied.

"An appropriate order will be entered."

The facts are uncomplicated and quite similar in both cases.

Hudson has an I.C.C. certificate which allows it to operate between Philadelphia and Warren County, New Jersey. It has another certificate which permits it to operate between that New Jersey area and Easton, Allentown, Scranton, and the Stroudsburg area. By tacking the two together it has been operating a freight route between Philadelphia and Easton, Allentown, Scranton and other Pennsylvania points in that latter section. Hudson does not have Pennsylvania Public Utility Commission authority for a freight route between Philadelphia and the stated Pennsylvania territory. It is argued most capably on behalf of Hudson that since it has the lawful I.C.C. certificates and since the practice of tacking is permitted, that it should be allowed to continue to so function.

Substantial evidence was presented at the hearing from which either by admission, directly or by proper inference, it could have been justifiably concluded that Hudson's routes between Philadelphia and Easton, Allentown, Scranton and other related Pennsylvania destinations were circuitous, that no stops were made between those points to pick up or deliver freight, that the mileage and time so consumed were both far greater than the distance and time to make such run by directly proceeding between Philadelphia and those places. There is some attempt at fringe contradiction of this but our own examination of the record satisfies us that at best this is quibbling; it actually ignores the supporting testimony and stresses that which is more favorable to Hudson. The Hudson Vice President in charge of traffic and sales was a witness. On direct examination he testified that his company's route above mentioned between Philadelphia and Scranton was the most direct route. He said the route was through New Jersey.

He said that using "these routes" is not subterfuge "because this is the only way Hudson Transportation can travel, via these routes because of our interstate authority, in MC–113993". With reference to those routes he said: "We generally operate around the clock, 24 hours a day, seven days a week." He admitted his company advertised in the Philadelphia Telephone Directory, "Direct service to points in Pennsylvania;" that it advertises in the Allentown, Scranton and Wilkes Barre telephone directories, "service in Pennsylvania," that it uses four full time solicitors for business who carry with them a point list of the points Hudson can serve or that it alleges it can service in Pennsylvania.

The witness was asked by the Examiner:

"If there was no regulation from the I.C.C. or Pennsylvania Public Utility Commission, what route would you take from Philadelphia to Scranton, *the shortest route, a practical route?*"

The witness answered:

"*In all probability I would take the turnpike*" which he said was in Pennsylvania. (Emphasis supplied).

With respect to the route Hudson takes between Philadelphia and Scranton, the witness was asked:

"Because you have the authority to go as you allege by way of New Jersey, that is the reason you take it that way?"

The answer was "Yes."

Asked, "So the only difference between what becomes interstate and intrastate is your determination to take it by way of New Jersey?" The witness answered, "It is not my determination. It is the only way we can get to Philadelphia via the gateway of Warren County."

The witness agreed with the testimony of Hudson's Executive Vice President before the Pennsylvania Public Utilities Commission that there were no stops in all Hudson's transportation between Allentown and Scranton and Philadelphia, including no stops made in New Jersey, also that there were no drop-offs in New Jersey, en route, or any pickups en route, in any of the instances involved in the complaints and that the transportation was performed at night, which the witness stated was the normal trucking company time for operation between terminals.

The evidence in the Arrow record is along the same lines. And in this instance also, the carrier position is presented with the utmost of lawyerlike skill. Some objection is raised in Arrow's complaint re dissimilarity of issues with the Hudson matter but before the Examiner when the cases were consolidated, Arrow agreed that "The issues are the same, and therefore I see no reason for a continuance, or for a separation of the issues." The record shows plainly that evidence common to both suits was available for use in the two suits.

Here again we have important testimony from a company executive, this time from the President of Arrow. He stated that all Arrow Philadelphia traffic, destined for Allentown and related Pennsylvania areas, proceeded in a course from Philadelphia to Trenton, New Jersey, Clinton, New Jersey, Phillipsburg, New Jersey, back across the Delaware River and on the Pennsylvania side to Allentown. There are an average of three to four loads a night over these routes in each direction. Covering the same ground he said, "Between Philadelphia and Pennsylvania points, we move three or four loads a night northbound and I would say two or three a night southbound. So you would have an average of six to seven loads a night, I would say, out of a total on your entire system, let us say of around 90 loads." The business has increased to those figures from a trailer load a day between Philadelphia and other points in Pennsylvania in 1959. From the President's evidence it was fairly inferable that Arrow trailers carry a full load of goods for either its Philadelphia or Allentown

terminal with no New Jersey stops to pick up or deliver goods.

Proofs applicable completely warranted the conclusion in this instance, as with Hudson, that Arrow's route was almost double Pennsylvania intrastate route mileage for the distance and for time of run.

Finally, as to the reason for this type of routing the President was asked the following questions and answered as appears:

"Q. In view of the fact that in each of these instances your New Jersey route is longer and involves more driving time, why do you go that way? Why don't you go the short route directly through Pennsylvania?

"A. It is the only authority that we have, granted from the ICC."

"N.T. 215.

"Exam. Hanback: Let us assume you had freight moving from Philadelphia to Easton and Scranton only and there were no regulations.

"Q. (By Mr. Graf) And no regulations.

"A. If there was no regulation, I guess you would take whatever you figured to be the—whether it was the shortest route or the one with the lowest traffic, you would take the most convenient route if there was no regulation.

"Q. Let us take another specific example, Philadelphia and Scranton, which way would you go?

"A. I would probably go over the [Pennsylvania] turnpike."

Enough has been presented of the evidence to reveal the virtually undisputed pertinent situation of Hudson and Arrow. Neither one of them possesses, nor it would seem can they obtain, Pennsylvania intrastate certificates for routes between Philadelphia and Allentown, Scranton and adjacent Pennsylvania municipalities. Each of them therefore took two of their I.C.C. interstate certificates and tacked them together. By virtue of this move, they both claim they now have the right to carry Pennsylvania intrastate freight under their tacked interstate certificates by way of New Jersey. This is not a physically surreptitious action. The carriers are not really seeking to hide this from view. What they maintain is that the certificates are genuine and that the practice of tacking them, with the result before us, is valid. That result is engaging in important Pennsylvania intrastate traffic under the aegis of their tacked I.C.C. certificates and so stultifying that state's control of its own intrastate, its local Pennsylvania motor carrier business.

■ The procedure followed by the Pennsylvania Public Utility Commission in bringing these situations to the Interstate Commerce Commission is entirely proper. The Supreme Court in Service Storage & Transfer Co., Inc. v. Virginia, 359 U.S. 171, 79 S.Ct. 714, 3 L.Ed.2d 717, (1959) has told us that the interpretation of the kind of problem before us is, in the first instance, for the Interstate Commerce Commission under § 204(c) of the Interstate Commerce Act, 49 U.S.C. § 304(c). And see Jones Motor Co. v. Pennsylvania Public Utility Commission, 361 U.S. 11, 80 S.Ct. 60, 4 L.Ed.2d 50, Pet. recon. and clar. den. 361 U.S. 904, 80 S.Ct. 204, 4 L.Ed.2d 160 (1959).

What the P.U.C. claimed to the Interstate Commerce Commission by its complaint was that in their actions outlined heretofore, Hudson and Arrow had abused their interstate certificates. In effect it alleged that the protested interstate routes of the truckers were nothing more than ingenious schemes to evade Commonwealth of Pennsylvania regulations of the intrastate motor carrier business concerned by running the vehicles under the tacked interstate certificates. In Service, see 359 U.S. p. 176, 79 S.Ct. 717, 3 L.Ed.2d 717, there was uncontracted evidence that the trucker's operation "* * * is not only practical, efficient and profitable, but also that the creation of this 'flow of traffic' is a timesaver to the shipper since there is less

time lost waiting for the making up of a full truck load. It also claims a unique service for less-than-truckload shipments of central Virginians who ship commodities to southwest Virginia and Kentucky and who otherwise would suffer long delays on deliveries or would be obliged to ship by special truck at higher rates. While these considerations are not controlling, they throw light on petitioner's claim of bona fides." Against this was proof by Virginia, 359 U.S. p. 175, 79 S.Ct. p. 717, 3 L.Ed.2d 717, " *  *  * that petitioner's routes were circuitous and often long, sometimes exceeding twice the shortest possible route. However, it offered no direct evidence of bad faith on the part of petitioner in moving its traffic through Bluefield, West Virginia."

The Supreme Court made no attempt to decide the question of bad faith in Service because it was of the opinion and so held, 359 U.S. p. 177, 79 S.Ct. p. 718, 3 L.Ed.2d 717: "It appears clear that interpretations of federal certificates of this character should be made in the first instance by the authority issuing the certificate and upon whom the Congress has placed the responsibility of action." The case was therefore reversed with the suggestion to the Commonwealth of Virginia that (359 p. 179, 79 S.Ct. p. 719, 3 L.Ed.2d 717): "If it believes that petitioner's operation is not bona fide interstate but is merely a subterfuge to escape its jurisdiction, it can avail itself of the remedy Congress has provided in the Act. Section 204(c), supra, note 2, authorizes the filing of a 'complaint in writing to the Commission by any  *  * State board  *  *  * [that] any  *  *  * carrier  *  *  *' has abused its certificate." Generally regarding "bona fide operation" see McDonald v. Thompson, 305 U.S. 263, 266, 59 S.Ct. 176, 83 L.Ed. 164 (1938); Eichholz v. Public Service Commission of Missouri, 306 U.S. 268, 274, 59 S.Ct. 532, 83 L.Ed. 641, Pet. for rehrg. den. 306 U.S. 622, 59 S.Ct. 532, 83 L.Ed. 641 (1939).

In these actions Pennsylvania has followed the course charted by the Supreme Court. The latter in Service noted the finding of the Interstate Commerce Commission in its own Service declaratory opinion, 71 M.C.C. 304. The Commission there acted on the carrier's petition for a declaratory order interpreting its certificate. The Virginia Commission did not participate in that proceeding. The I.C.C. construed petitioner's certificate as authorizing Virginia to Virginia traffic routed through Bluefield, West Virgina. As to this, it states, as quoted in Service, Note 4, 359 U.S. p. 178, 79 S.Ct. p. 718, 3 L.Ed.2d 717: "In the absence of any showing that petitioner's use of its authorized route is a subterfuge to avoid State regulation, or other than a logical and normal operation through the carrier's headquarters, we are of the opinion that petitioner's operations, in the manner described, constitute bona fide transportation in interstate commerce." There was no occasion under the circumstances for the Supreme Court to pass upon that rule in its Service opinion. It is, however, squarely before us now and is in our judgment a sound, fair test for evaluating the operations of the carriers with which we are concerned.

From all of the evidence in these two suits the unavoidable conclusion is that the Hudson and Arrow routes involved are not logical and normal operations through their headquarters; that the use by Hudson and Arrow of their tacked on routes is a deliberate, calculated method employed by those carriers to avoid the unfavorable consequences to them of their intrastate Pennsylvania traffic coming within the rightful jurisdiction of the Utility Commission of that Commonwealth. Said evidence overwhelmingly points to those tacked on routes as artificial, contrived arrangements adopted by Hudson and Arrow in order to obtain desirable Pennsylvania intrastate business which would be otherwise unavailable to them. The record makes it very clear that we are here dealing not with bona fide transportation in interstate commerce but with a mystic maze route which is a more or less shrewd expedient designed solely to

escape the control of the Pennsylvania Commission. In the full sense of the word, the operations are subterfuges.[1]

■■ It is strongly evident from the whole of the evidence that plaintiffs have abused their disputed certificates and that the Interstate Commerce Commission was justified in so finding and in issuing its cease and desist orders. This was appropriate action in accordance with the opinion of the Supreme Court in Service, supra, and with the mandate of the National Transportation Act "to cooperate with the several States and the duly authorized officials thereof". 49 U.S.C. Preamble to the Interstate Commerce Act.

The complaints will be dismissed.

1. In accordance with the instruction of the Supreme Court in Service, supra, the Pennsylvania Public Utility Commission filed a complaint against Jones Motor Co., Inc. before the Interstate Commerce Commission. After hearing, the Commission Examiner, following the Service decision, found that the longer, circuitous routes utilized by Jones in and of themselves were not proof of bad faith or subterfuge. The Commission adopted the Examiner's statement of facts but concluded that the Jones transportation constituted a subterfuge. The Jones company filed a complaint in the United States District Court for the Eastern District of Pennsylvania seeking reversal of the Commission's decision. That case was heard in due course and has just been decided (D.C.1963, 218 F.Supp. 133). The majority opinion held that the Commission's Order is not supported by substantial evidence, that the evidence proved the interstate character of 108 shipments which were comingled with the 22 challenged intrastate shipments; that less than five per cent of plaintiff's business concerns such challenged transportation; that aside from testimony that Jones' routes were circuitous and somewhat long, no direct evidence of bad faith on the part of Jones was offered. The Court then concluded that "Since the Commission, in its Order, bottomed its finding of bad faith solely upon the circuity of routing by Jones after agreeing with the Examiner in most respects, we must reject this unwarranted conclusion and adopt the Examiner's 'Corrected Report and Recommended Order.'" (Emphasis supplied).

The Jones facts as presented in the majority opinion, are practically those noted in Service. The situation in Hudson and Arrow is radically different. In both these disputes, the Commission has justifiably found that the all important element of subterfuge in endeavoring to escape the impact of Pennsylvania supervision is the entire motivation of the routing via New Jersey. Also in Jones the Examiner found that, with regard to the circuitous routing, "It is not illogical, but in fact is more practical and feasible from the standpoint of operating efficiency and economy, for a carrier to include in the same vehicles with 108 shipments, which are admittedy in interstate commerce and moving over routes specified in its interstate certificates, 22 other shipments, over a period of four specified days, which, if defendant had held the appropriate authority, might technically have been moved by themselves over a shorter route." Under the particular facts, the Examiner said that it was not likely the carrier would have used a shorter route even if such had been available. He himself recognized the vital difference between the Jones facts and those in Hudson and Arrow. He stated:

"In the Hudson case division 1 found subterfuge because there was no logical reason for the circuitous routing via another State other than that the defendants therein were without appropriate intrastate authority, and in fact defendants therein admitted that, in the absence of any regulation of the challenged transportation, more direct routes would have been employed. Assuming that the division's findings in the Hudson case are not reversed after consideration of the pending petitions for reconsideration, the decision in that case does not form a basis for a holding of subterfuge in the instant proceeding." (Emphasis supplied).

As we have seen, the referred to findings of Division 1 in Hudson and Arrow were affirmed by the Commission.

From all of the above it is apparent that on substantially different facts found by the Interstate Commerce Commission Examiner, accepted by the Commission and relied upon by the District Court, the routing in the Jones litigation was upheld. The issue before us as we have above detailed is not the one found by the Court to exist in Jones and there decided. Actually the Jones decision in effect strongly supports the rightness of our conclusion in these cases on their own particular facts.