828 A.2d 935 (2003)
362 N.J. Super. 445
QBE INSURANCE COMPANY, Plaintiff-Appellant,
v.
P & F CONTAINER SERVICES, INC., Jimmy Bedon, and Ioannis Kollas, Defendants,
and
Augustin Semeina and The Connecticut Indemnity Company, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted May 7, 2003.
Decided July 30, 2003.
*936 Kulick, Brennan & Krochta, Somerville, attorneys for appellant (Christopher McKenna, on the brief).
Cohn, Lifland, Pearlman, Herrmann & Knopf, Saddle Brook, attorneys for respondent Augustin Semeina (Joseph A. Maurice, of counsel; James P. McGovern, on the brief).
Gregory Jaeger, North Brunswick, attorney for respondent The Connecticut Indemnity Company.
Before Judges WEFING, WECKER and LISA.
The opinion of the court was delivered by WECKER, J.A.D.
This appeal involves the scope of coverage required for a leased vehicle under a federally-mandated endorsement to an interstate trucker's liability policy. The Law Division judge decided cross-motions for summary judgment in favor of coverage shortly after the complaint was filed and before any discovery had taken place. We now reverse and remand for a determination whether the leased vehicle was involved in interstate commerce either by virtue of the terms of the lease agreement or the nature of the trip.
On January 16, 2001, a tractor owned by defendant Ioannis Kollas, leased to defendant *937 P & F Container Services, Inc. (P & F), and operated without an attached trailer by P & F's employee, defendant Jimmy Bedon, collided with a passenger vehicle operated by defendant Augustin Semeina. Semeina sustained personal injuries. The accident occurred while the tractor was en route to the Elizabeth Marine Terminal at P & F's direction to pick up a shipment of goods allegedly intended for delivery elsewhere in New Jersey. The terminal, also known as Port Elizabeth, is operated by the Port Authority of New York and New Jersey.
P & F is a motor carrier registered with the Surface Transportation Board (the Board) of the United States Department of Transportation (DOT) for transportation of property.[1]See 49 U.S.C.A. §§ 13901, 13902. The Kollas tractor apparently was not carrying a DOT placard or other sign identifying it as a vehicle registered for interstate transport on the date of the accident.[2] P & F carried liability insurance under a trucker's liability policy issued by plaintiff, QBE Insurance Corporation (QBE). Kollas insured the vehicles under a non-trucker's policy issued by defendant Connecticut Indemnity Company (Connecticut) (also known as a "bobtail" policy). The Connecticut policy covered the tractor when it was not involved in business trucking activities.
The tractor was not listed on the QBE policy's schedule of covered vehicles. The policy included, however, Endorsement MCS-90, as mandated by Sections 29 and 30 of the Motor Carrier Act of 1980. See 49 C.F.R. § 387.7(d)(1), which requires insurance companies who insure vehicles owned or leased by interstate trucking companies to include this additional coverage, up to the required levels, 49 C.F.R. §§ 387.9 and 387.303, regardless of whether the vehicle is listed as a covered vehicle on the policy. 49 C.F.R. § 387.15, adopted pursuant to 49 U.S.C. § 13906(a)(1) and (f). A "lease" is defined under 49 U.S.C.A. § 13102 and 49 C.F.R. § 376.2(e) as "a contract or arrangement in which the owner grants the use of the equipment ... to an authorized carrier for use in the regulated transportation of property."
The endorsement in the prescribed form reads, in relevant part:
In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicles is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.
....
The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment *938 that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

[49 C.F.R. § 387.15 and Illustration I.]
Under the express terms of the MCS-90 (also referred to as "the endorsement"), its scope supercedes any limitations, exclusions, exceptions, or conditions of the base policy.
The history and policy behind federal regulation of interstate carriers, specifically with respect to their use of leased tractor-trailers, has been set forth in many cases, both federal and state. E.g., T.H.E. Ins. Co. v. Larsen Intermodal, 242 F.3d 667, 672 (5th Cir.2001); Progressive Casualty Ins. Co. v. Hoover, 570 Pa. 423, 809 A.2d 353, 359 n. 9, n. 10 (2002). The Fifth Circuit in T.H.E. Ins. Co. summarized that history and the underlying public policy:
The MCS-90 was required under the regulations of the now-defunct Interstate Commerce Commission ("ICC"). When the ICC was abolished, its authority to regulate carriers was transferred to the Department of Transportation, but the old regulations remain in effect until new ones are promulgated. John Deere Ins. Co. v. Nueva, 229 F.3d 853, 855 n. 3 (9th Cir.2000). This Court has stated that ICC endorsements are governed by federal law. Canal Ins. Co. v. First Gen. Ins. Co., 889 F.2d 604, 610 (5th Cir.1989), modified on other grounds, 901 F.2d 45 (5th Cir.1990) (citing Carter v. Vangilder, 803 F.2d 189, 191 (5th Cir.1986)).
We have also held that the policy embodied in the ICC regulations "was to assure that injured members of the public would be able to obtain judgments collectible against negligent authorized carriers." Canal v. First Gen., 889 F.2d at 611. Thus, the insurer's obligations under the MCS-90 are triggered when the policy to which it is attached provides no coverage to the insured. The First Circuit has aptly described the obligation placed upon the insurer by the MCS-90 as one of suretyship. "[W]e consider the ICC endorsement to be, in effect, suretyship by the insurance carrier to protect the publica safety net.... [I]t simply covers the public when other coverage is lacking." Canal Ins. Co. v. Carolina Cas. Ins. Co., 59 F.3d 281, 283 (1st Cir.1995).

[T.H.E. Ins. Co., 242 F.3d at 672.]
The insurer's obligations under the MCS-90 are triggered when the policy to which it is attached otherwise would provide no coverage to the insured. Ibid. In other words, under the endorsement, the insurer becomes a surety for the interstate carrier in any case where there is no other coverage provided, either by that carrier or indirectly by the owner of the leased vehicle. See Progressive Casualty, 809 A.2d at 360 n. 11. The overriding purpose of the MCS-90 is to protect innocent, injured members of the public, like Semeina. See T.H.E. Ins. Co., 242 F.3d at 673; John Deere Ins. Co. v. Nueva, 229 F.3d 853, 857-58, 860 (9th Cir.2000). Federal statutes and regulations governing interstate truckers' use of leased tractors are aimed at protecting the public by applying safety and financial responsibility rules both to owned and leased vehicles. See, e.g., Harris v. Mitchell, 358 N.J.Super. 504, 507-08, 818 A.2d 443, 444-45 (App.Div.2003); Moore v. Nayer, 321 N.J.Super. 419, 428 and n. 7, 729 A.2d 449, 454 and n. 7 (App.Div.1999); Casey v. Selected Risks Ins. Co., 176 N.J.Super. 22, 31, 422 A.2d 83, 87 (App.Div. 1980); see also Pierre v. Providence Washington Ins. Co., 99 N.Y.2d 222, 227-230, 754 N.Y.S.2d 179, 181-84, 784 N.E.2d 52 (2002).
The motion judge concluded that the MCS-90 endorsement was applicable in *939 this case even if this accident occurred on a trip that was entirely intrastate, simply because P & F was a federally-registered interstate carrier. The judge said:
[T]he Defendant, the carrier, the hauler in this particular case, P & F, is registered in interstate commerce, whenever they lease a tractor, whether or not it's in interstate commerce, the carrier [is] required to provide liability insurance to cover that vehicle.
In this case therefore, I find that ... regardless of the fact that the vehicle was not being used in interstate commerce, that it was nonetheless required to be covered,[3] and that therefore QBE owes a duty to defend the driver and owner of the vehicle as well as P & F, and therefore, I will order a summary judgment in favor of the Defendant[s]... compelling QBE to defend and cover to the limit of $250,000, P & F, Kollas, and Bedon.

[ (emphasis added).]
Thus the motion judge ordered QBE to provide a defense and indemnification to P & F, Bedon, and Kollas, thereby benefitting Semeina.
The issue on this appeal is whether the operative regulation, 49 C.F.R. § 387.15, and the required MCS-90 endorsement, require QBE to defend and cover Semeina's claims against these defendants. In order to make that determination we must consider the scope of the federal regulation, that is, whether coverage under the MCS-90 endorsement applies (1) to all vehicles operated by a registered interstate carrier on all trips in the course of its trucking business, including trips within the state, as the Law Division judge concluded; or (2) in the somewhat narrow circumstances when the trip "involves" interstate commerce either because the vehicle was available for interstate transport pursuant to the lease or because the trip was one leg of a shipment that originated in or was intended for transport through interstate commerce; or (3) only under more narrow circumstances, when the trip itself either originated or was intended to conclude out of state.
The motion judge relied on Cox v. Bond Transportation, Inc., 53 N.J. 186, 249 A.2d 579 (1969), and Planet Ins. Co. v. Anglo American Ins. Co., 312 N.J.Super. 233, 711 A.2d 899 (App.Div.1998), to conclude that New Jersey courts define "interstate commerce" broadly, and that under controlling federal law, the MCS-90 requires coverage for all transport undertaken by or on behalf of a registered interstate carrier (alternative # 1 above). The judge also concluded that it was legally irrelevant whether the tractor displayed an interstate carrier's placard.
On appeal, QBE argues that alternative # 3 above is the controlling rule of law. Connecticut and Semeina argue that alternative # 3 is contrary to Cox and Planet. They contend that for purposes of this case it does not matter whether we adopt alternative # 1 or # 2 above because even if not all of P & F's trucking is in interstate commerce and covered by the endorsement, this trip to Port Elizabeth obviously involved cargo that originated out of state. Connecticut and Semeina urge us to take judicial notice of the fact that the port handles almost exclusively interstate shipments, that this trip must be deemed to involve interstate commerce, and therefore that the endorsement applies.
*940 QBE also argues that these dispositive motions were heard before it had the opportunity for discovery, and it is entitled to the opportunity to learn the details of the tractor's mission on the day of the accident. We will return to the discovery issue.
Careful reading of Cox convinces us that it is neither alternative # 1 nor alternative # 3, but rather alternative # 2 above, that describes the scope of coverage under the MCS-90 endorsement. Cox, which arose out of a 1965 accident, arose in a somewhat different procedural posture than the case at hand. There the injured plaintiffs won verdicts on their negligence claims against an interstate trucking company and the owner-operator of its leased tractor-trailer. The Appellate Division reversed, and the plaintiffs appealed. The Supreme Court described the issue before it:
The basic issue is whether by reason of the Interstate Commerce Commission regulations defendant [trucking company] as a certificated interstate carrier, should be deemed to have had such possession and control over the tractor at the time of the accident as to make it liable for [the owner-operator's] negligent operation. The trial court held that under the evidence adduced the issue was a factual one for jury determination.

[Cox, 53 N.J. at 191, 249 A.2d at 581.]
The Court agreed and reinstated the jury verdict, holding that under I.C.C. regulations, Bond was liable for damages caused by a collision between its leased, owner-operated tractor-trailer and a member of the public.[4]
In Cox, where the operator was not a regular employee of the interstate carrier, there was a material question of fact respecting the relationship between the operator and the carrier. The I.C.C. decal was therefore significant circumstantial evidence that the operator and the leased tractor were engaged in the carrier's interstate business, and the presumption created by the I.C.C. decal was not rebutted. The Court left no doubt, however, that once a master-servant relationship was found between them, federal law required the interstate carrier to accept responsibility for injuries caused by the operator's negligence.
Here, unlike the circumstances in Cox, it was P & F's regular employee, Bedon, who was driving the leased vehicle. There can be no question that the leased tractor was being operated for P & F's benefit, whether or not P & F's I.C.C. decal was displayed at the time. Thus there is no question of P & F's vicarious liability raised in this appeal. The question of fact here is whether the Kollas vehicle either was actually involved in, or was available for, the transport of goods in interstate commerce.
A careful reading of Cox informs our decision. These were the facts in Cox. Under the terms of an oral lease, the tractor's owner was to undertake both interstate and intrastate oil deliveries on behalf of Bond and was to receive a percentage of Bond's revenues from those deliveries. On the day of the accident, the owner had transported four or five loads of oil from the Paragon Oil Company in Newark to a Bond customer in Whippany, a trip that was obviously entirely within the state. On arriving back at Bond's terminal, the driver discovered that his personal vehicle would not start. He decided to drive the tractor home and return it to the *941 terminal the next day, something he did often with Bond's knowledge. On his way home he was involved in an accident. The truck was carrying a handmade cardboard sign identifying the trucker by name and I.C.C. number.
After dismissing the plaintiff's common law vicarious liability claim because he found the operator to be an independent contractor, the judge allowed the jury to answer the question "whether [the trucking company] was vicariously liable for [the operator's] negligence because he was a lease-operator whose tractor bore either a metal decal or a sign indicating that he was operating it on the public highway[s] under [the trucking company's] I.C.C. franchise and within the activity authorized by it." Cox, 53 N.J. at 196, 249 A.2d at 583. The jury answered "Yes."
The Appellate Division reversed on the ground that the operator "was not operating his tractor in interstate commerce at the time of the accident and therefore Bond could not be deemed to be in possession and control of it within the meaning of the Interstate Commerce Commission regulations." Id. at 196-97, 249 A.2d at 584. As an independent contractor, the Appellate Division held that the operator's negligence did not warrant vicarious liability. Id. at 197, 249 A.2d at 584. It was undisputed in Cox that "with the exception of one interstate movement all of [the operator's] trucking for [the interstate carrier] was intrastate." Id. at 194, 249 A.2d at 583. The Court continued:
But it does not follow therefrom that his lease-operator agreement was limited to intrastate work. There is substantial evidence to show that his engagement was an unqualified oneto assist generally in the transportation operations of [the trucking company] without any specification or restrictions respecting either interstate or intrastate operation.

[Ibid.]
The Supreme Court found that the federal statute and regulations "eliminate the common law distinction between an independent contractor and an employee. They create a type of statutory employment...." Id. at 205, 249 A.2d at 589. The Court analyzed the issue under federal law and quoted the I.C.C.'s own identification of the problem that prompted a regulatory remedy:
"It is clear that the hard core of the problem confronting the Commission * * * has been the owner-operator trip lease and its attendant evils, such as widespread indifference to carrier responsibility, to safety of operations, and to the scope of carrier operating authority."
There can be no doubt that the Commission regarded the trip-leasing arrangement as a device which made it difficult for a member of the public injured by the operation of a vehicle so leased to fix carrier responsibility. The regulatory aim was to remedy that evil and Congress concurred in the objective.

[Id. at 200-01, 249 A.2d at 586 (citation omitted).]
Bond had argued that it was not responsible for the tractor owner-operator's negligence because he was on a trip entirely within New Jersey when the accident occurred. The Court addressed the trucking company's argument that the federal regulations "apply only when the equipment actually is engaged in its business on a public highway in interstate commerce." 53 N.J. at 202, 249 A.2d at 587.
If a franchised carrier needs the use of owner-operated tractors in his business, he may lease them exclusively for intrastate or exclusively for interstate transportation, or he may engage them to be *942 available for both intrastate and interstate operation. If he engages the lessor-operator expressly for intrastate carriage alone, and exercises no control over the operation of the vehicles, ordinarily the lessor is an independent contractor and the I.C.C. regulations would not apply to the localized transportation. If the lease is for interstate transportation, manifestly Section 1057.4 of the regulations does apply.[5] If, however, there is evidence, even though conflicting, showing that the lessor-operator was engaged to be available generally in the carrier's business, both interstate and intrastate, and that the carrier by overt acts qualified him for such operation, and the jury finds that he was so engaged and qualified, then under the regulations the carrier must be held to have assumed "exclusive possession, control and use of and to be responsible for the operation of the vehicle whenever it is being driven on the public highway in the interest of the carrier.

[Ibid. (emphasis added).]
Thus the Court's broad interpretation of the scope of federal regulation of the carrier's leased tractors nonetheless was not without limits. The Court reasoned:
It is neither sensible nor consistent with the basic intention of the Commission protection of the public against dangers incident to the operation of franchise-authorized vehiclesto apply such a vacillating standard as Bond suggests for determining whether the carrier is responsible under Section 1057.4(a)(4) of the regulations for a particular movement of an owner-operated leased vehicle. For example, franchised carriers are required to provide liability insurance not only to cover vehicles owned and used by them in authorized transportation, but also for non-owned equipment leased from the owner-operator to be used in such transportation. See 49 U.S.C. § 315; Vance Trucking Co. v. Canal Insurance Co., [249 F.Supp. 33, 39 (D.S.C.1966).] Insurance coverage which would protect an injured member of the public one day when the lessor-operated tractor was in interstate carriage, and which would shift away the next day because the leased equipment was in intrastate operation making the operator an independent contractor, thus relieving the carrier of vicarious liability, cannot be the result envisaged by Congress or the Interstate Commerce Commission.

[Id. at 202-03, 249 A.2d at 587-88.]
"The court stated unequivocally that I.C.C. regulation over the use of leased equipment must be construed most liberally in the interest of members of the public using the highways." 53 N.J. at 203, 249 A.2d at 588. The Court clearly interpreted the federal regulation to be applicable to all carriage by a leased vehicle that was available for interstate transport on behalf of an I.C.C. certificated carrier, even if the specific travel at the time of the accident was entirely within the state.
[I]t has been said that a person engaged in intrastate commerce by motor vehicle as a regular occupation is not exempt from Interstate Commerce Commission regulation "if he undertakes also even casual or occasional transportation" in interstate commerce. Bass v. United States, 163 F.Supp. 1 (W.D.Va.1958). In fact, the Commission by administrative ruling has indicated that the leasing regulations *943 apply unless the non-owned lessor-operated equipment is used solely in intrastate commerce. Adm. Ruling No. 104, 2 C.C.H. Fed. Carr. Rep. § 25, 104 (1957). This ruling gives recognition to the Congressional intention that the use and operation of leased vehicles be put on a parity with equipment owned and operated by the authorized carrier and operated by its own employees. Brannaker v. Transamerican Freight Lines, Inc., 428 S.W.2d 524 (Mo.Sup.Ct.1968).

[Id. at 204, 249 A.2d at 588 (emphasis added).]
The Court explained:
We have already indicated that there is no absolute requirement that the lessor-operator must be driving in interstate transportation at the time of an accident in order for the type of statutory employment envisioned by the regulations to exist. In our view when a lessor-operator is engaged for and authorized to operate in interstate business, as may be inferred upon the furnishing of a decal and a carrier name-sign for the leased equipment, and from the actual use thereof in interstate transportation on one occasion within a short time after the inception of the relationship, the carrier's responsibility for the negligence of the operator may be found during the period of the lease whenever the operation, whether intra or interstate, is in any way with the knowledge and for the benefit of the carrier.

[Id. at 206, 249 A.2d at 589 (emphasis added).]
The significance of Cox for the case before us is that it establishes New Jersey law respecting the application of federal regulations to a registered interstate carrier who operates a leased vehicle on New Jersey highways. So long as the leased vehicle is available to the carrier for both interstate and intrastate trips, even if the specific trip is intrastate, federal rules of financial responsibility apply, including the MCS-90 insurance endorsement.
More recently, in Planet, 312 N.J.Super. 233, 711 A.2d 899, we held that under an MCS-90 endorsement, an I.C.C. carrier's insurer was responsible for coverage on claims arising out of the operation of a leased tractor, and a bobtail policy issued by another insurer did not cover the accident.[6] As in Cox, the issue in Planet was vicarious liability.
The central issue is whether at the time of the accident, the tractor was being "used in the course and scope of the commercial business of the [i]nsured." We find that it was, and thus Anglo's policy does not provide coverage.

[Planet, 312 N.J.Super. at 238, 711 A.2d at 902.]
We held that the trip involved in Planet, which was undertaken for the purpose of "getting the tractor repaired[,] inured to [the trucking company's] benefit," and therefore the endorsement applied. Id. at 240, 711 A.2d at 903. Implicitly if not explicitly, we found the repairs to be part of the carrier's interstate operation.
Under Cox, the leased vehicle's availability for use in the motor carrier's interstate trucking operation triggers Board jurisdiction and liability coverage under the MCS-90 endorsement required by federal regulation. If this trip itself involved interstate commerce, that also triggers coverage. If this trip did not involve interstate commerce, that fact may be evidence of the limited terms of the lease, even though the intrastate trip *944 would not necessarily remove the vehicle from the Board's regulatory jurisdiction.
Cox and Planet are consistent with a substantial body of federal case law that looks to the nature and course of a cargo's transport, not merely the individual leg of its trip, to determine whether that leg is deemed to be in interstate or intrastate commerce. Some background in the applicable federal law will help to define the relevant facts to be developed on remand in this case.
Whether the ICC/DOT regulation and the MCS-90 endorsement apply to the trip in question is "predicated on the recognized federal power over interstate commerce." Leonard Exp., Inc. v. United States, 298 F.Supp. 556, 560 (W.D.Pa. 1969). See Atlantic Coast Line R. Co. v. Standard Oil Co., 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270 (1927); see also Hudson Transp. Co. v. United States, 219 F.Supp. 43 (D.N.J.1963). To distinguish interstate from intrastate commerce in hauling, the essential character of the commerce must be analyzed. Atlantic Coast Line R. Co., supra, 275 U.S. at 268, 48 S.Ct. at 110, 72 L.Ed. at 274. In that case, the United States Supreme Court found intrastate commerce where the Standard Oil Company of Kentucky transported imported oil by rail and motor from coastal storage facilities to inland bulk stations throughout Florida. Id. at 269-70, 48 S.Ct. at 110-11, 72 L.Ed. at 275. Title to the oil did not pass to Standard until after the oil had been delivered in Florida. The Court noted: "The important controlling fact in the present controversy, and what characterizes the nature of the commerce involved, is that [Standard's] whole plan is to arrange deliveries of all its oil purchases on the seaboard of Florida so that they may all be there stored for convenient distribution in the state...." Id. at 269, 48 S.Ct. at 111, 72 L.Ed. at 275.
The mere fact that cars received on interstate movement are reshipped by the consignee, after a brief interval, to another point, does not, of course, establish an essential continuity of movement to the latter point. The reshipment, although immediate, may be an independent intrastate movement.

[Baltimore & Ohio South-Western R.R. Co. v. Settle, 260 U.S. 166, 173-74, 43 S.Ct. 28, 31, 67 L.Ed. 189, 193 (1922).]
The Eighth Circuit Court of Appeals addressed the very issue before us in Century Indem. Co. v. Carlson, 133 F.3d 591 (8th Cir.1998). That court found a shipment of corn from within the State of Minnesota to a seaport in that State to be interstate commerce where the carrier knew the corn would be shipped to other states. Thus, the court concluded, the accident was covered by the carrier's liability policy pursuant to the MCS-90 endorsement. The court reasoned that the farmer making the shipment had a "fixed and persistent intent" to send his corn to the river grain terminal, from which he knew that the corn would be shipped out-of-state, even though the shipment occurred wholly within the state and the farmer had a subjective belief that the shipment was being made within intrastate commerce. Id. at 598-99.
The Eighth Circuit drew a similar distinction in an earlier case, Roberts v. Levine, 921 F.2d 804 (8th Cir.1990). There the plaintiff had been cited in a criminal misdemeanor complaint for operating a motor carrier without the appropriate Minnesota permit. Id. at 805. However, a state permit was not required for interstate commerce, due to preemption, and there could be no offense if an operation was in interstate commerce. Id. at 814-15. The complaint concerned different products and separate trips, all commenced *945 and completed entirely within the state. One shipment involved fertilizer, which, after being shipped to a warehouse in the state, was to be moved by rail to a location in Canada. The court found this shipment to be interstate in nature because the hauler had a "fixed and persisting intent" to engage in interstate commerce. Id. at 814.
The hauler also made two shipments of soybeans to processing plants in the state. The soybeans were to be made into soybean meal and soybean oil and then shipped out of state. The court found that these shipments to the processing plants were intrastate in nature because the hauler did not have a fixed and persisting intent to ship the soybeans beyond the processing plants. Id. at 816.
In Progressive Casualty Ins. Co. v. Hoover, 570 Pa. 423, 809 A.2d 353 (2002), the Pennsylvania Supreme Court reversed summary judgment in favor of a personal injury plaintiff and against the insurance company which had issued a trucker's policy that included the MCS-90 endorsement. The Court ruled that whether the tractor-trailer was engaged in intrastate or interstate commerce at the time of the accident was a factual question that barred summary judgment. Id. at 368. On the same ground, the Court rejected the insurance company's argument that "since it was undisputed that the shipment via [this] truck occurred entirely within Pennsylvania, the MCS-90 was inapplicable as a matter of law.... [T]his analysis is misleading in its failure to confront the controlling question of whether and to what degree the interstate and intrastate phases of the transportation of the [shipment] should be deemed interrelated...." 809 A.2d at 368.[7]
The mixed question of law and fact essential to resolve the coverage question before us is whether the Kollas tractor is deemed to have been engaged in interstate commerce at the time of the accident, either based upon the lease agreement or the nature of the trip. Unfortunately, the terms of the lease and the nature of the relationship between P & F and Kollas are not clearly ascertainable from the record before us.[8] Neither the terms of the agreement between P & F and Kollas, nor the tractor's use before the accident, nor the details of the trip and the intended shipment, are sufficiently evident to permit us to answer the question whether the tractor was operating in interstate commerce. It may well be that P & F's use of the Kollas tractor was sufficiently involved in interstate activity to fall under endorsement MCS-90 issued by QBE even if the trip itself was entirely within New Jersey. There is also the possibility that the tractor falls within the narrow window of intrastate commerce as defined by the Supreme Court in Baltimore & Ohio and Atlantic Coast Line R.R. Co. and by the Eighth Circuit in Roberts.
We recognize that on its motion for summary judgment, QBE bore *946 the burden of establishing that the tractor was leased for use and actually used solely within the State of New Jersey. QBE obviously failed to avail itself of the opportunity to obtain in discovery any of the background facts it might have relied upon to meet that burden before filing its summary judgment motion. On the other hand, on the cross-motion for summary judgment declaring that QBE's endorsement applied, it was Connecticut's and Semeina's burden to establish the interstate nature of the truck lease or the trip on the day of the accident. Because we are satisfied that the motion judge overstated the holding of Cox, it is appropriate to remand the matter for a determination of coverage under the correct rule of law. On remand, the parties shall have an opportunity to discover all the facts relevant to the coverage question.
Discovery should be aimed at producing evidence that will allow the court to make a finding whether the tractor was available for interstate travel under the terms of the lease agreement and whether the trip that P & F's driver made with the leased Kollas tractor was "interstate in nature."[9]
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] The Surface Transportation Board replaced the Interstate Commerce Commission (I.C.C.) as of January 1, 1996. See ICC Termination Act, 109 Stat. 803 (1995), Pub.L. 104-88, effective Jan. 1, 1996. United States Code sections governing motor carriers were renumbered by that enactment. Prior registration as a motor carrier with the I.C.C. remained effective under the Board. 49 U.S.C.A. § 13905(a).
[2] The police accident report contains spaces for entering "USDOT Carrier No." and "ICC Carrier No." Those spaces were left blank.
[3] As we shall explain, this conclusion is not warranted based upon the record before us or the applicable law.
[4] Cox was decided before the enactment of a federal regulation mandating the MCS-90 endorsement. On its face, the lawsuit was between the injured plaintiff and the trucking company; it was not tried as an insurance coverage case.
[5] The provisions of that section of the Code, since renumbered, provided that the carrier assumed full responsibility for use of leased tractors during the lease term "as if the motor vehicles were owned by the motor carrier." 49 C.F.R. § 376.11. See 49 U.S.C.A. § 14102(a)(4), formerly § 11107.
[6] Unlike the arguments in Planet, we see no contention in this appeal that there is liability coverage for this accident under the Connecticut bobtail policy.
[7] The Pennsylvania Supreme Court did not address, as did the New Jersey Supreme Court in Cox, the leased vehicle's availability for interstate transport (under the terms of the lease) as a basis for federal regulatory jurisdiction. We cannot tell whether that is because the Pennsylvania court considered and rejected that approach, or because the argument was not made, "the parties [having] agree[d] that the determination of whether Progressive's [MCS-90] mandates payment ... depends upon which general regulatory scheme (federal or state) applies to the transportation, and, concomitantly, its interstate versus intrastate character." 809 A.2d at 358(emphasis added)(footnote omitted).
[8] Contrary to federal law, there may have been no written lease between P & F and Kollas. See 49 U.S.C.A. § 14102(a); 49 C.F.R. § 376.11(a).
[9] Despite the default of P & F, Bedon, and Kollas in this lawsuit, the parties from whom such discovery most likely would be needed, the subpoena power of the court is available on remand.